PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.                                          No. 06-4257

MICHAEL LAWRENCE BRANCH,
        *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(1:05-cr-00016-CCB)

Argued: May 15, 2008

Decided: August 20, 2008

Before WILKINSON and GREGORY, Circuit Judges,
and Henry F. FLOYD, United States District Judge for the District
of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Floyd joined. Judge Gregory wrote a dissenting opin-
ion.

## COUNSEL

**ARGUED**: Kenneth Wendell Ravenell, Baltimore, Maryland, for
Appellant. Andrea L. Smith, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF**: Rod
J. Rosenstein, United States Attorney, Jonathan G. Cooper, Law

Clerk, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

We are asked to review several rulings of the district court in the trial and sentencing of Michael Lawrence Branch for the possession and distribution of cocaine base and the illegal possession of a firearm. Branch's principal claim is that the district court erred under the Fourth Amendment in failing to suppress evidence seized from his person and vehicle during a traffic stop. In particular, Branch claims that the basis for the search of his car, a positive alert by a drug-sniffing dog, was only performed after the police had unconstitutionally prolonged a routine traffic stop.

After careful consideration, we reject Branch's claim. There is no question that the police were allowed to detain Branch after witnessing him commit a traffic violation, and, during this detention, the police formed a "reasonable suspicion" of ongoing criminal activity that justified extension of the traffic stop. *See Terry v. Ohio*, 392 U.S. 1 (1968). We also find Branch's other claims to be without merit, and we therefore affirm Branch's conviction and sentence.

I.

A.

Throughout the second half of 2004, Michael Branch was the subject of a narcotics investigation conducted by a detective from Anne Arundel County, Maryland. Twice during this period — on September 2 and September 14 — an undercover detective purchased cocaine base from Branch.

On the night of October 29, while the narcotics investigation of Branch was still ongoing, police officer Tim White observed Branch, driving a white Mercedes Benz sedan, run a red light. White stopped

the Mercedes at 6:50 p.m. and reported the location of the traffic stop and the car's license plate number, make, and model over his police radio. Upon receiving White's report, the dispatcher informed White that the same vehicle had been involved in a traffic incident on October 10. The dispatcher's response reminded White that he had been a backup officer for the prior incident, during which the Mercedes was pulled over in an area known for high volume drug trafficking.

After communicating with dispatch, White approached the driver's side of the sedan. While doing so, White observed that Branch was accompanied by a front seat passenger, later identified as Robert Cedric Johnson. White also noticed several air fresheners hanging in the car and a strong odor of laundry detergent. White asked Branch for his license and the car's registration. As Branch produced the documents, White observed that Branch's hand was "shaking" and that neither Branch nor Johnson would make eye contact with him.

White then reviewed Branch's license. Although White had never previously met Branch, he recalled Branch's name being mentioned by his fellow police officers in connection with drugs. White also noticed that Branch's address was in the same high volume drug area where the Mercedes had been pulled over on October 10. Finally, White observed that the Mercedes was not registered to Branch; instead, it was registered to a Christine Retz, who lived at a different address than Branch.

After confirming with Branch that he still resided at the address on his license, White returned to his police car. Given that it was dark and that there were two men in the Mercedes, White contacted dispatch at 6:51 p.m. and requested a backup unit on the scene. White also inquired as to whether a canine officer was available.

While waiting to hear about the availability of a canine officer, White broadcast Branch's name over his police radio. An officer replied by stating that Branch was "well known" to deal drugs.

At approximately 6:53 p.m., dispatch reported that no canine unit was available. In response, White requested the phone number for the Maryland Transportation Authority ("MTA") police. Two minutes later, dispatch provided White with the number, and White immedi-

ately called the MTA. The MTA informed White that they had a canine unit available at BWI airport, and they agreed to send the unit to support White. According to White, BWI airport was ten to fifteen minutes from the scene of the traffic stop.

At 6:56 p.m., White called dispatch to check Branch's license and the Mercedes's license plate against the Maryland Motor Vehicle Administration ("MVA") database. While awaiting a response, White began to fill in Branch's traffic citation. At 6:58 p.m., dispatch advised White that Branch's license was valid and that there were no outstanding warrants for his arrest. Two minutes later, dispatch reported that the Mercedes's registration was not on file with the MVA. Given this, White asked dispatch to check whether the vehicle's title number was on file. The MVA had no record of the title number either.

At approximately 7:03 p.m., White thus returned to the Mercedes to ask Branch about the vehicle's registration. Branch said that the car's owner, Retz, was his cousin, and that she had authorized him to use the Mercedes. White then asked Branch for Retz's phone number so he could confirm the story, but Branch said that Retz was unavailable because she was "in the Bahamas on her honeymoon." During this interaction, White again observed that Branch refused to make eye contact with him.

White returned to his vehicle and, at approximately 7:10 p.m., asked dispatch for information pertaining to the address listed on the Mercedes's registration. At 7:14 p.m., dispatch provided White with a telephone number. White called the number and spoke with a woman who identified herself as Christine Retz's mother. When questioned about the Mercedes, Retz's mother stated that she thought her daughter had returned the car to the dealer. When asked if Retz was in the Bahamas, Retz's mother, directly contradicting Branch's statement, said that Retz was in Baltimore and merely out for the night. Retz's mother then gave White Retz's cell phone number.

White subsequently called Retz, who confirmed that Branch was allowed to drive her Mercedes. White then began to finish writing Branch's traffic citation. At approximately 7:17 p.m., the MTA police officer Vincent Edwards arrived with a drug-sniffing dog. Two min-

utes later, White approached the Mercedes to issue a completed citation to Branch. Simultaneously, Edwards began to walk the dog around Branch's vehicle. When the dog reached the front passenger side, it gave a "positive alert," indicating that it had detected the presence of drugs.

At this point, both Branch and Johnson were instructed to exit the car. Edwards then placed the canine in the car, where the canine alerted again by scratching the dashboard near the glove compartment. White then forced open the locked glove compartment, finding cocaine base, a digital scale with white residue on it, assorted baggies (frequently used to bag cocaine base), and three unlabeled prescription bottles that contained assorted pills. Elsewhere in the car, White found five cell phones and $400 in cash inside a jacket pocket.

White then placed Branch under arrest. The Mercedes was seized and transported to the police station, where a more thorough search uncovered a firearm concealed between the right rear seat and the right rear door jamb, more baggies, further tiny amounts of crack cocaine, and a traffic citation that had been issued to Branch while driving the Mercedes on October 9, 2004.

### B.

On January 20, 2005, a grand jury in the District of Maryland returned a four-count indictment against Branch. The first two counts charged Branch with distribution of cocaine base to an undercover police officer on September 2 and 14, 2004. *See* 21 U.S.C. § 841. Counts three and four charged Branch with illegal possession of a firearm, *see* 18 U.S.C. § 922(g)(1), and possession with intent to distribute cocaine base, *see* 21 U.S.C. § 841. These latter two charges arose from the events precipitated by White's October 29, 2004 traffic stop of the Mercedes driven by Branch.

Branch, through counsel, filed three pre-trial motions relevant to this appeal. On February 24, 2005, he filed a motion to suppress any evidence seized from him or his vehicle during the October 29, 2004 traffic stop. On September 8, 2005, Branch filed a motion to sever counts one and two of his indictment from counts three and four. On October 7, 2005, Branch filed a motion to exclude evidence of his

2001 arrest and 2002 conviction for possession with intent to distribute cocaine base. After hearing testimony and oral argument, the district court denied all three of Branch's motions.

Branch's trial commenced on December 12, 2005. At trial, Branch sought to call Johnson, the passenger in the Mercedes driven by Branch on October 29, 2004, as a witness. Branch hoped that Johnson would invoke his Fifth Amendment privilege against self-incrimination before the jury. The district court denied Branch's request because it felt that calling Johnson to the stand "would lead to speculation and unfair prejudice."

After three days of trial, a jury found Branch guilty on all four counts of his indictment. The jury also found that, with respect to count four, Branch possessed "50 grams or more" of cocaine with an intent to distribute.

At the conclusion of the evidence, and also after the jury's verdict, Branch filed a motion for judgment of acquittal with respect to count three of his indictment (the felon in possession count). On December 20, 2005, the district court denied Branch's motion for judgment of acquittal. On February 24, 2006, the district court sentenced Branch to 20 years for each count of distributing cocaine, 10 years for his illegal possession of a firearm, and 25 years for possession with intent to distribute more than 50 grams of cocaine base. The district court stated that it ordinarily would have calculated Branch's sentencing range under the federal guidelines by applying a two-level enhancement to Branch's sentence for count four (the intent to distribute charge stemming from the October 29, 2004 traffic stop) because Branch possessed a dangerous weapon during the offense. But the court went on to find that Branch was a career offender, thereby subjecting Branch to an increased sentencing range of 30 years to life; the court departed downward from that range to a sentence of 25 years after considering the factors set out in 18 U.S.C. § 3553. Finally, the district court ordered the sentences to run concurrently.

Branch filed a timely appeal, challenging the district court's denial of his pre-trial motions, the district court's refusal to allow Johnson to take the stand to invoke the Fifth Amendment, the district court's denial of his motion for judgment of acquittal, and the district court's

imposition of a sentencing enhancement with respect to count four. We discuss each of Branch's claims in turn.

## II.

Branch first challenges the district court's denial of his motion to suppress the evidence discovered during the October 29, 2004 traffic stop. In particular, Branch claims that the basis for the search of his car, the positive alert by a drug-sniffing dog, *see, e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 409 (2005), was performed pursuant to an unconstitutional investigatory detention. Branch contends that "there is simply no justification" for a police officer taking "over 30 minutes to complete a traffic stop for running a red light," and that Officer White had "no independent justification or reason to detain [Branch] beyond the reasonable duration" of the lawful traffic stop. *Brief of Appellant* at 23, 34. Branch thus argues that the evidence gathered from him and his car on October 29, 2004 must be suppressed under the Fourth and Fourteenth Amendments as the fruits of an unlawful search. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

## A.

We begin our analysis of Branch's claim with a review of the Fourth Amendment law governing traffic stops. It is well established that the "[t]emporary detention of individuals during the stop of an automobile by the police . . . constitutes a 'seizure,'" no matter how brief the detention or how limited its purpose. *See Whren v. United States*, 517 U.S. 806, 809 (1996); *see also Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren*, 517 U.S. at 810.

Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop. *See, e.g.*, *Caballes*, 543 U.S. at 407; *Whren*, 517 U.S. at 810; *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). Thus, pursuant to such a stop, a police officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation." *Foreman*,

369 F.3d at 781. A canine sniff is also constitutionally acceptable if performed within "the time reasonably required" to issue a traffic citation. *Caballes*, 543 U.S. at 407, 410. This is because a dog sniff is not a search within the meaning of the Fourth Amendment, and it therefore requires no additional justification. *Id.* at 408-09; *see also United States v. Place*, 462 U.S. 696, 707 (1983).

The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). Thus, once the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver "must be allowed to proceed on his way." *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992). Of course, if the driver obstructs the police officer's efforts in any way — for example, by providing inaccurate information — a longer traffic stop would not be unreasonable. *See United States v. Sharpe*, 470 U.S. 675, 687-88 (1985).

If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place. *See Royer*, 460 U.S. at 500. Thus, a prolonged automobile stop requires either the driver's consent or a "reasonable suspicion" that illegal activity is afoot. *See Foreman*, 369 F.3d at 781; *see also Royer*, 460 U.S. at 500-01; 4 Wayne R. LaFave, *Search and Seizure* § 9.3(f), at 399. While a precise articulation of what constitutes "reasonable suspicion" is "not possible," *Ornelas v. United States*, 517 U.S. 690, 695 (1996), the precedents of the Supreme Court and this circuit suggest several principles that should animate any judicial evaluation of an investigatory detention pursuant to *Terry*.

First, *Terry*'s "reasonable suspicion" standard is "less demanding . . . than probable cause." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Indeed, in order to justify a *Terry* stop, a police officer must simply point to "specific and articulable facts which, taken together with rational inferences from those facts," *Terry*, 392 U.S. at 21, evince "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity," *Wardlow*, 528 U.S. at 124 (quoting

*Terry*, 392 U.S. at 27 (internal quotations omitted)). Thus, the quantum of proof necessary to demonstrate "reasonable suspicion" is "considerably less than [a] preponderance of the evidence." *Wardlow*, 528 U.S. at 123.

Second, a court must take a commonsense and contextual approach to evaluating the legality of a *Terry* stop. *Ornelas*, 517 U.S. at 695-96; *see also United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). To that end, the Supreme Court has noted that "reasonable suspicion" is a "nontechnical conception[ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas*, 517 U.S. at 695 (internal quotations omitted).

Thus, context matters: actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances. And respect for the training and expertise of police officers matters as well: it is entirely appropriate for courts to credit "the practical experience of officers who observe on a daily basis what transpires on the street." *Lender*, 985 F.2d 151, 154 (4th Cir. 1993); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002). In sum, *post hoc* judicial review of police action should not serve as a platform for "unrealistic second-guessing" of law enforcement judgment calls. *Sharpe*, 470 U.S. at 686-87.

Third, a court's review of the facts and inferences produced by a police officer to support a *Terry* stop must be holistic. Courts must look at the "cumulative information available" to the officer, *Arvizu*, 534 U.S. at 273, and not find a stop unjustified based merely on a "piecemeal refutation of each individual" fact and inference, *United States v. Whitehead*, 849 F.2d 849, 858 (4th Cir. 1988). A set of factors, each of which was individually "quite consistent with innocent travel," could still, "taken together," produce a "reasonable suspicion" of criminal activity. *United States v. Sokolow*, 490 U.S. 1, 9 (1989). "It is the entire mosaic that counts, not single tiles." *Whitehead*, 849 F.2d at 858.

Fourth, a police officer's decision to stop and detain an individual must be evaluated objectively. *See, e.g.*, *Wardlow*, 528 U.S. at 123;

*Terry*, 392 U.S. at 21-22. Thus, the lawfulness of a *Terry* stop turns "not on the officer's actual state of mind at the time the challenged action was taken," *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985), but rather on "an objective assessment of the officer's actions," *Scott v. United States*, 436 U.S. 128, 137 (1978). In other words, if sufficient objective evidence exists to demonstrate reasonable suspicion, a *Terry* stop is justified regardless of a police officer's subjective intent.

To sum up: If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle. The driver's consent or reasonable suspicion of a crime is necessary to extend a traffic stop for investigatory purposes. In order to demonstrate reasonable suspicion, a police officer must offer "specific and articulable facts" that demonstrate at least "a minimal level of objective justification" for the belief that criminal activity is afoot. *Wardlow*, 528 U.S. at 123; *Terry*, 392 U.S. at 21. Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement.

Finally, we note that, when considering the denial of a motion to suppress, we review the district court's legal determinations *de novo* and its factual determinations for clear error. *See United States v. Buckner*, 473 F.3d 551, 553 (4th Cir. 2007). Since the district court denied the defendant's motion below, we construe the evidence in the light most favorable to the government. *See United States v. Uzenski*, 434 F.3d 690, 704 (4th Cir. 2006).

B.

Applying these principles to Branch's case, we find no constitutional violation. The district court, after considering the evidence presented by both parties and hearing testimony from the principals involved in the October 29 stop (including Branch and White), found that the police possessed sufficient constitutional justification to authorize Branch's 30-minute detention. We think the district court

was correct to so find, and we therefore affirm the district court's denial of Branch's motion to suppress.

We begin with the basic fact that much of Branch's 30-minute detention was justified by the "ordinary inquiries incident" to a routine traffic stop. *See Caballes*, 543 U.S. at 408. After observing Branch running a red light, Officer White was entitled to detain Branch in order to issue him a citation and confirm that he was permitted to drive the Mercedes. Moreover, as the district court noted, the stop was "extended as a direct result of [Branch] providing inaccurate information about the location of Christine Retz." *United States v. Branch*, No. CCB-05-0016, at 6 (D. Md. Nov. 29, 2005) (memorandum order). If Branch had merely "provided [Retz's] cell phone number rather than claiming she was in the Bahamas, the officer could have reached her without the effort of obtaining an address and phone number and speaking to her mother before reaching [Retz] herself." *Id.*

While the government urges us to hold that Branch's entire 30-minute detention was necessary to perform the routine functions attendant to a traffic stop, *see Brief of Appellee* at 13-15, we need not go so far. This is because, as the district court found, Officer White possessed additional justification for detaining Branch in the form of a "reasonable articulable suspicion of narcotics activity." *Branch*, No. CCB-05-0016, at 6 (D. Md. Nov. 29, 2005) (memorandum order). This reasonable suspicion was more than sufficient to authorize the "relatively small part," if any, of Branch's detention "not attributable to the traffic stop." *Id.* at 6-7.

Crediting the district court's finding of the facts, it is clear that, within minutes of detaining Branch, Officer White had observed enough "specific and articulable facts" to generate a "reasonable suspicion" of illegal activity. We discuss these facts in turn.

To begin, the district court noted that as White first stopped Branch's Mercedes he remembered that the vehicle had been pulled over less than a month ago in an area known to be an "open air drug market." *Id.* at 6. While this fact alone is not enough to generate reasonable suspicion, "an area's propensity toward criminal activity is something that an officer may consider." *Lender*, 985 F.2d at 154; *see*

*also Wardlow*, 528 U.S. at 124; *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997). Context is important in evaluating a reasonable suspicion determination, and the fact that the Mercedes had only recently been pulled over in an area known for open-air drug trafficking could serve to put Officer White on alert.

White's suspicions were only heightened by his first encounter with Branch. White noticed that Branch's hands were shaking as he handed over his license and registration, and that neither Branch nor his passenger would make eye contact. As the Supreme Court has stated, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124; *see also Foreman*, 369 F.3d at 785. Moreover, as the district court recognized, White observed two other factors during this encounter that could contribute to a "reasonable suspicion": first, the presence of several air fresheners — "commonly used to mask the smell of narcotics" — hanging in the Mercedes, *Foreman*, 369 F.3d at 785, and, second, the fact that the Mercedes was not registered to Branch, and that Branch offered "no proof of authority to operate the vehicle," *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998) (collecting cases).

Finally, immediately after terminating his conversation with Branch and broadcasting Branch's name over the police channel, White was informed by a fellow police officer that Branch was "well known" to deal drugs. *Branch*, No. CCB-05-0016, at 2 (D. Md. Nov. 29, 2005) (memorandum order). Coming on the heels of White's encounter with Branch, this information only served to heighten White's suspicion of criminal activity. *See Sprinkle*, 106 F.3d at 617.[1]

---

[1] The government urges us to consider Branch's provision of false information to Officer White as a factor in our "reasonable suspicion" calculus. *Brief of Appellee* at 17. While false statements are "suspicious," *see United States v. Wilson*, 953 F.2d 116, 125 (4th Cir. 1991), and therefore properly considered under *Terry* and its progeny, we note that Branch's provision of inaccurate information is only of limited relevance to Officer White's "reasonable suspicion" in this case. This is because Officer White only became aware that Branch's statements about Retz's whereabouts were inaccurate at approximately 7:15 p.m., a full 25 minutes after Branch's detention began.

While each of these factors may individually be insufficient to evince "reasonable suspicion," in concert they demonstrate that Officer White had more than a "hunch" that criminal activity was afoot. *Terry*'s "reasonable suspicion" standard recognizes that police officers are trained to spot crimes as they occur, and that such determinations often require spur-of-the-moment, context dependent judgments based on less than probable cause. *See Lender*, 985 F.2d at 154 (quoting *Adams v. Williams*, 407 U.S. 143, 145 (1972)) (noting that police officers are "not required in the absence of probable cause simply to 'shrug [their] shoulders and allow a crime to occur'"). This is precisely the sort of judgment made by Officer White in this case, and we decline to "unrealistic[ally] second-guess[ ]" his informed determination. *Sharpe*, 470 U.S. at 686-87.

Thus, like the district court, we hold that Officer White's 30-minute detention of Branch was constitutional. Officer White was entitled to detain Branch after observing him run a red light, and White's performance of his routine duties pursuant to this traffic stop justifies a large portion of Branch's detention. Furthermore, to the extent that Branch was detained beyond the reasonable length of a traffic stop, Officer White possessed a "reasonable articulable suspicion of narcotics activity" sufficient to justify the continued detention.

Branch argues that his 30-minute detention should be ruled unlawful because Officer White inquired into the availability of a drug-detecting dog immediately upon returning to his vehicle after procuring Branch's license and the car's registration. Branch contends that this inquiry demonstrates that Officer White's "attention was improperly focused on searching the car instead of on effectuating the actual purpose of the [traffic] stop, *i.e.*, determining if Branch's license and registration were valid and issuing the appropriate citation for running the red light." *Brief of Appellant* at 23-24. Branch claims that this is

---

Of course, as discussed earlier, Branch's inaccurate statement regarding Retz did send Officer White on a wild goose chase in his attempt to confirm that Branch was authorized to drive the Mercedes. This statement thus prolonged the amount of time Officer White was entitled to detain Branch pursuant to the routine traffic stop.

evidence that Officer White unnecessarily — and unconstitutionally — "prolonged the stop until the canine officer arrived." *Id.* at 23.

We reject this argument on two levels. First, Branch's argument is incorrect as a factual matter. As the district court noted, Officer White stopped Branch after he saw him "run a red light at [an] intersection." *Branch*, No. CCB-05-0016, at 1 (D. Md. Nov. 29, 2005) (memorandum order). This is surely a lawful reason to perform a traffic stop, and, indeed, Branch does not argue that Officer White's original decision to stop him was pretextual. Thus, all indications are that Officer White initially stopped Branch merely to ticket him for a traffic violation.

Moreover, almost all of the factors discussed above as indicia of "reasonable suspicion" were known to Officer White *before* he inquired into the availability of a drug-detecting dog: the prior traffic stop of the Mercedes in a drug-trafficking area, Branch's evident nervousness, the presence of air fresheners, and the fact that Branch was driving a car not registered to him. These factors, in combination, could form the basis for a "reasonable suspicion" of narcotics trafficking, and they certainly make it far from improper for Officer White to inquire into the availability of a drug-detecting dog. Indeed, after developing a "reasonable suspicion of narcotics activity," Officer White may have promptly inquired into the availability of a drug-detecting dog in order to lessen the amount of time he would have to delay Branch.

Second, Branch's focus on Officer White's subjective frame of mind is unpersuasive. As recognized by the district court, *see Branch*, No. CCB-05-0016, at 2 n.2 (D. Md. Nov. 29, 2005) (memorandum order), Supreme Court precedents "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren*, 517 U.S. at 812-13 (noting further that "[s]ubjective intentions play no role" in analyzing automobile stops); *see also Macon*, 472 U.S. at 470-71. Focusing Fourth Amendment challenges upon objective indicia of criminal activity is most consistent with the ultimate safeguard that searches and seizures must be reasonable; a benignly motivated search is not sustainable if no reasonable grounds exist to support it. Allowing subjective challenges to police action would risk turning

nearly all seizures into speculative inquiries into often unfathomable human motive. Thus, the inquiry into whether a police officer possessed a "reasonable suspicion" of criminal activity is properly an objective one, focused solely on "specific and articulable" facts. *See, e.g., Wardlow*, 528 U.S. at 123; *Terry*, 392 U.S. at 21-22. It is such facts that the district court found justified the officer's actions in this case.[2]

### III.

Branch next claims that the district court erred by denying his motion to sever his claims for trial. In particular, Branch argues that counts one and two — charging distribution of cocaine base on two occasions in September 2004 — were "factually unrelated" to counts three and four — charging illegal possession of a firearm and possession with intent to distribute cocaine base on October 29, 2004. *Brief of Appellant* at 45. Branch also contends that holding a single trial on all four counts was unfairly prejudicial because the jury "likely concluded" that Branch's guilt on the first two counts meant that he was also guilty of the third and fourth counts. *Id.* at 46. The district court considered and rejected those arguments. We conclude that the district court acted within its substantial discretion in declining to sever the counts.

Under Federal Rule of Criminal Procedure 8(a), a single indictment may charge a defendant with multiple counts if the offenses charged

---

[2]Branch finally claims that the drug-detecting dog's "positive alert was not sufficient to create probable cause to conduct a warrantless search of [his] vehicle," since it was "the only indicator that contraband may have been inside the vehicle." *Brief of Appellant* at 42-43 (emphasis omitted).

We reject this claim for two reasons. First, it is well settled that a "positive alert" from a drug detection dog, in and of itself, provides probable cause to search a vehicle. *See United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994); *see also United States v. Eura*, 440 F.3d 625, 630 (4th Cir. 2006), *vacated on other grounds*, 128 S. Ct. 853 (2008). Second, as the district court found, the police in this case did indeed possess further evidence beyond the "positive alert" on which to base probable cause. *See supra* at 10-11 (discussing other evidence that confirmed the "positive alert").

"are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Joinder of related charges is broadly permitted to avoid needless duplication of judicial proceedings, *United States v. Mir*, 525 F.3d 351, 356-57 (4th Cir. 2008), particularly where evidence of one charge would be admissible to prove another charge, *see United States v. Peoples*, 748 F.2d 934, 936 (4th Cir. 1984). Nonetheless, Rule 14(a) provides that "[i]f the joinder of offenses . . . appears to prejudice a defendant or the government, the court may order separate trials of counts." Fed. R. Crim. P. 14(a). The party seeking severance bears the burden of demonstrating "a strong showing of prejudice," *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984), and we are mindful that the district court's denial of a motion to sever "should be left undisturbed, absent a showing of clear prejudice or abuse of discretion." *United States v. Acker*, 52 F.3d 509, 514 (4th Cir. 1995).

Under these principles, Branch's arguments for severance lack merit. The four counts in Branch's indictment — all stemming from episodes of cocaine base possession or distribution within a period of two months — are certainly so related as to permit joinder under the broad scope of Rule 8(a). And Branch's conclusory assertion of unfairness fails to satisfy his burden of demonstrating a strong showing of prejudice. Instead, we credit the district court's finding that, even if it had severed Branch's charges, evidence of Branch's distribution of cocaine base under counts one and two would have been admissible at a trial on counts three and four. *Branch*, No. CCB-05-0016, at 8 (D. Md. Nov. 29, 2005) (memorandum order). Indeed, the evidence of Branch's earlier cocaine distribution was probative of Branch's knowledge — which he contested — of the cocaine base and firearm in the Mercedes. Thus, the district court properly exercised its discretion in denying Branch's request to sever, which would have resulted only in an unnecessary duplication of efforts by the court, witnesses, and a second jury.

IV.

Branch next claims that the district court erred by admitting evidence of his arrest in 2001 and resulting conviction in 2002 for possession with intent to distribute cocaine base. In particular, Branch

contends that testimony of the police officer who arrested Branch in 2001 was both irrelevant and severely prejudicial. *Brief of Appellant* at 48-49. Again applying abuse of discretion review, *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004), we conclude that the district court properly admitted evidence of Branch's prior criminal act.

Under Federal Rule of Evidence 404(b), evidence of prior "crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but the district court may admit evidence of past acts for other purposes, such as proving knowledge or intent. Fed. R. Evid. 404(b); *Hodge*, 354 F.3d at 311-12. The danger of unfair prejudice should not, of course, substantially outweigh the evidence's probative value. Fed. R. Evid. 403; *Hodge*, 354 F.3d at 312. But where the district court provides a limiting instruction to the jury, "the fear that the jury may improperly use the evidence subsides." *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997).

Our decision in *Hodge* is controlling. In *Hodge*, we affirmed a district court's admission of evidence of previous drug transactions under Rule 404(b) in a prosecution for possession of cocaine with intent to distribute and illegal possession of a firearm by a felon. *See* 354 F.3d at 307, 311-12. As in *Hodge*, the evidence of Branch's 2001 drug crime was relevant to Branch's knowledge and intent in 2004. And the district court here did not abuse its discretion in finding, as in *Hodge*, that the danger of unfair prejudice failed to substantially outweigh the probative value of the evidence. The government's considerable evidence of Branch's distribution of cocaine base in September 2004 alleviated the risk that the jury might react irrationally to the evidence of drug possession from 2001. And the district court reduced any remaining danger of unfair prejudice by instructing the jury that it could consider the Rule 404(b) evidence only to prove Branch's knowledge and intent, not as "proof that he had a criminal personality or a bad character" or as "a substitute for proof that he committed the crime that he is charged with." Thus, we affirm the district court's denial of Branch's Rule 404(b) motion.

V.

Branch also claims that the district court erred by denying Branch's request to call Robert Johnson as a witness. Although the district

court was aware that Johnson (the passenger in the Mercedes driven by Branch on October 29, 2004) would invoke his Fifth Amendment privilege against self-incrimination, Branch contends that the court should have required Johnson to take the stand to invoke that privilege before the jury. Branch asserts that this process was necessary because the jury could have concluded that Johnson, not Branch, owned the cocaine base and firearm found in the Mercedes. *Brief of Appellant* at 50-51.

We conclude that the district court's evidentiary ruling was not an abuse of discretion. *See United States v. Leftenant*, 341 F.3d 338, 342 (4th Cir. 2003). The district court found that placing Johnson on the stand solely to invoke his Fifth Amendment privilege would lead to "unfair prejudice" in the form of both unwarranted speculation by the jury and the government's inability to cross-examine Johnson. And any inferences that the jury might have drawn from Johnson's privilege assertion would have been only minimally probative — and likely improper — in any event. *See, e.g., Johnson v. United States*, 318 U.S. 189, 196-97 (1943); *United States v. Reyes*, 362 F.3d 536, 541-42 (8th Cir. 2004).

VI.

Branch next claims that the district court erred in denying his motion for judgment of acquittal on count three, charging illegal possession of a firearm by a felon. *See* 18 U.S.C. § 922(g)(1). In particular, Branch asserts that the government failed to present any direct evidence that Branch possessed or even knew of the gun that was concealed out of Branch's reach on the rear passenger side of the Mercedes. *Brief of Appellant* at 52-53. But Branch also concedes that constructive possession is sufficient to support a conviction under Section 922(g)(1). *See Brief of Appellant* at 52; *United States v. Gallimore*, 247 F.3d 134, 136-37 (4th Cir. 2001). As we have held, "[a] person has constructive possession over contraband when he has ownership, dominion, or control over the contraband itself or over the premises or vehicle in which it [is] concealed." *United States v. Singleton*, 441 F.3d 290, 296 (4th Cir. 2006) (quoting *United States v. Armstrong*, 187 F.3d 392, 396 (4th Cir. 1999)).

Applying our well-known substantial evidence standard, *see United States v. Burgos*, 94 F.3d 849, 862-63 (4th Cir. 1996) (en banc), we

affirm Branch's conviction on count three. The government presented evidence of the following: that Branch was driving the Mercedes on October 29, that Branch previously had driven the Mercedes on October 9, that Branch's cousin owned the Mercedes and had granted Branch permission to drive it, that Branch acted nervously when stopped by Officer White, that Branch gave a false explanation of his cousin's whereabouts to Officer White, and that the car contained both cocaine base and large amounts of cash. Taken together and viewed in the light most favorable to the government, *see id.*, these facts would allow a reasonable jury to conclude beyond a reasonable doubt that Branch was in control of the Mercedes on October 29 and thereby constructively possessed the firearm concealed in the vehicle. Branch's nervousness, lack of truthfulness, and the presence of drugs and cash also support a reasonable inference that Branch both exercised control over the car and was aware of its contents, including the firearm. Thus, we affirm Branch's conviction under Section 922(g)(1).

## VII.

Finally, Branch challenges his sentence. In particular, Branch claims that the district court erroneously enhanced his sentence for count four — his conviction for possession with intent to distribute — under U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) (2005). That section authorizes a sentence enhancement for possession of a dangerous weapon, including a firearm. Branch did not raise this claim before the district court, so we review his sentence for plain error. Fed. R. Crim. P. 52(b); *United States v. White*, 405 F.3d 208, 215 (4th Cir. 2005).

We find no error here, much less plain error. As in *White*, Branch's constructive possession of a firearm authorized an enhancement under Section 2D1.1(b)(1). *See White*, 405 F.3d at 211-12, 214-15. Branch argues that his sentence was improper under *United States v. Goines*, 357 F.3d 469 (4th Cir. 2004), but that decision addresses only the danger of duplicative calculations under 18 U.S.C. § 924(c) and does not apply here. And in any event, the district court ultimately calculated Branch's sentencing range under the federal guidelines for count four based on the fact that Branch was a career offender; and that career offender sentencing range was entirely independent of

Branch's firearm possession. *See* U.S. Sentencing Guidelines Manual § 4B1.1 (2005). Thus, the enhancement under Section 2D1.1(b)(1) had no impact on Branch's sentence and could not have affected Branch's "substantial rights." Fed. R. Crim. P. 52(b). We therefore affirm Branch's sentence, which was otherwise reasonable. *See Gall v. United States*, 128 S. Ct. 586 (2007).

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

Because in my view the record does not support the Majority's conclusion that the police did not unreasonably prolong the detention of the defendant, I must respectfully dissent.

At approximately 6:50 p.m., Officer Timothy White pulled over the defendant for running a red light. Less than 75 seconds later, with only basic information about the defendant, Officer White requested a drug dog. Officer White only knew that: (1) the defendant lived in the Freetown community, and (2) he had been pulled over in Freetown driving the same white Mercedes Benz for an investigative stop nine days earlier when Officer White had served as a backup. After hearing that a drug dog was not available, another officer told Officer White the defendant was a well-known drug dealer and that the defendant "knows the law . . . so getting in the car is going to be difficult." (J.A. 381.) Officer White then said "10-4, I'm gonna see if we can find a dog. Maybe MDTA [Maryland Transportation Authority] has one if we don't, and if they can get here in a reasonable amount of time, we'll uh, wait on that." (J.A. 381.) At 6:55 p.m, Officer White contacted the MDTA and spoke with Officer Vincent Edwards about the availability of his drug dog. (J.A. 163.) Officer Edwards confirmed that he was available and proceeded to the location of the traffic stop.

While Officer White waited for Officer Edwards to arrive, approximately six minutes after stopping the defendant for a routine traffic violation, he finally called in the defendant's information. At 6:58 p.m., Officer White learned that the defendant's license was valid and there was no warrant for his arrest. Seven minutes had passed and Officer White had still not issued a citation to the defendant. At 7:00

p.m., the MDTA told Officer White that the vehicle's registration was not on file. (J.A. 321.) This was the second time the defendant had been pulled over and the MDTA did not have the vehicle's registration on file although the vehicle was registered. Officer White asked the defendant for the contact information for the registered owner of the vehicle. Officer White testified that the defendant told him that the owner was out of the country on her honeymoon and that Officer White would be unable to reach her. (J.A. 94-95.) At 7:12 p.m., Officer White radioed the dispatcher to locate a telephone number for the registered owner. Once contacted the registered owner confirmed that the defendant was permitted to drive her vehicle. At 7:17 p.m., Officer Edwards arrived and spoke to Officer White. Afterwards Officer White finally began to finish writing the citation then at 7:20 p.m. more than thirty minutes after Officer White had pulled the defendant over and just as Officer White was about to give the citation to the defendant, Officer Edwards's dog walked around the front passenger area of the defendant's vehicle and alerted.

The Supreme Court found in *Illinois v. Caballes*, 543 U.S. 405, 407-408 (2005), that ". . . a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Using the example[1] of an officer issuing a warning ticket, the Court went on to declare that "a seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* The Court then declared that a dog sniff that occurred during an unreasonably prolonged traffic stop and after which contraband was discovered, would be the product of an unconstitutional seizure and therefore illegal. *Id.*

A police officer who detains a driver beyond the time necessary to

---

[1]The example was based on the facts in *People v. Cox*, 782 N.E.2d 275 (Ill. 2002) where a defendant had been stopped for speeding, and without reasonable articulable suspicion to detain, the police officer radioed for a drug dog which took fifteen minutes to arrive on the scene. The Illinois Supreme Court found, and the Supreme Court agreed here, that the fifteen minutes was unreasonably long for a routine traffic citation. *Caballes*, 543 U.S. at 407-408.

complete his routine traffic stop must have a justification for doing so other than the initial traffic violation. *See Florida v. Royer*, 460 U.S. 491, 500 (1983). Consequently, a prolonged traffic stop requires either the driver's consent or a reasonable articulable suspicion that illegal activity is afoot. *See United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004); *see also Royer*, 460 U.S. at 500-01. Under this standard, it is clear that Officer White's prolonged detention of the defendant was not justified by reasonable articulable suspicion.

The Majority's decision to affirm the district court hinges on two main points. I strongly disagree with both. First, they argue that the prolonged detention was the direct result of the defendant providing misinformation about the location of the registered owner. (Maj. Op. 11.) I am unpersuaded by this argument because Officer White never believed the defendant's claim that the owner was out of the country on her honeymoon and thus Officer White immediately contacted the dispatcher to get the owner's contact information. Furthermore, it only took a few minutes for Officer White to radio the dispatcher, receive a contact number, talk to the owner's mother, and then make contact with the owner. This hardly justifies an over thirty-minute detention.

Second, the Majority maintains that Officer White "possessed additional justification for detaining the defendant in the form of a 'reasonable articulable suspicion of narcotics activity.'" (Maj. Op. 11.) However, each of the factors relied upon when analyzed, individually or as a whole, either is insufficiently established or did not provide reasonable articulable suspicion. First, the Majority states that "as White first stopped Branch's Mercedes he remembered that the vehicle had been pulled over less than a month ago in an area known to be an 'open air drug market.'" (Maj. Op. 11.) I am troubled about the Majority's use of this information because the vehicle had been pulled over once before for an investigative stop and there was nothing that linked this vehicle to illegal drug activity. There was a problem with the registration then as is the case now and similarly no one could explain what was wrong with the registration given that the car was properly registered.

Furthermore, there are many people who visit and/or reside in communities that are considered to have a "propensity toward criminal

activity"; merely having been pulled over once before for an investigative stop is not sufficient to establish a connection to illegal drug activity. It is important to point out that this routine traffic stop did not occur in an area with a propensity toward criminal activity. In fact this incident happened in a relatively affluent neighborhood, thus our case law that says that "an area's propensity toward criminal activity is something that an officer may consider" is not germane to this incident. *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

In addition, the Majority uses Officer White's observation that there were several air fresheners in the vehicle as a factor for determining reasonable articulable suspicion. Although our case law holds the existence of air fresheners may be considered a factor in establishing reasonable articulable suspicion if combined with other factors, I do not find that there is sufficient evidence here to establish that there were in fact air fresheners in the vehicle. When cross-examined Officer White could not state how many air fresheners were present although he testified earlier that there was one hanging from the rearview mirror. (J.A. 86, 117.) Further, the conflicting testimony from the defendant and Officer Edwards that there were *no* air fresheners in the vehicle at the very least calls into question whether there were in fact air fresheners. Officer Edwards also admitted that his dog had falsely alerted to the presence of drugs in the field and a half a dozen times in training because of air fresheners. (J.A. 165-166.) Officer Edwards did not recall seeing any air fresheners or smelling any particular odor when he approached the passenger side of the vehicle, which had its window down. (J.A. 166.) In fact, given the dog's propensity to falsely alert in the presence of air fresheners, the dog's handler would be expected to pay special attention to air fresheners' potential presence as distractors. It is highly persuasive that Officer Edwards did not notice any air fresheners in the car nor a particular odor of air fresheners. This is after Officer White testified that when he was standing near the vehicle the odor was so strong "to the point it was almost unbearable to stand there and breathe it." (J.A. 86.) Officer Edwards's testimony clearly contradicted that of Officer White. In sum, there is insufficient evidence to establish the presence of air fresheners and at the very least there was evidence that called into question Officer White's wavering testimony in this regard.[2]

---

[2]Additionally, no photograph of the air fresheners were ever produced.

Finally, the Majority contends that the fact that the car was not registered to the defendant and the defendant "offered 'no proof of authority to operate the vehicle'" was an additional factor. However, this as a factor was clearly nullified by Officer White who talked to the registered owner and was told the defendant was authorized to drive her vehicle.

With those factors clearly discounted, only two factors that the Majority cites for support of reasonable suspicion remain: (1) the defendant's reputation as a drug dealer and (2) his nervousness and the alleged reluctance to make eye contact with the officer. Neither of these factors individually nor collectively is sufficient to establish reasonable articulable suspicion. As we held in *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997), "a prior criminal record is not, standing alone, sufficient to create reasonable suspicion. Nevertheless, an officer can couple knowledge of prior criminal involvement with more concrete factors in reaching a reasonable suspicion of current criminal activity." However, Officer White's testimony that the defendant seemed nervous and did not make eye contact with him do not amount to concrete factors that would create reasonable suspicion. Most people when they are pulled over by the police are nervous. Absent excessive signs of nervousness, this factor does not support Officer White's suspicion that the occupants were engaged in criminal activity. Furthermore, Officer White had never had direct contact with the defendant and, therefore, could not compare the defendant's behavior to prior experiences. Given that most people are nervous when pulled over by police officers, Officer White's observation that the defendant seemed nervous in conjunction with the defendant's reputation as a drug dealer does not in my opinion rise to the level of reasonable articulable suspicion that would justify a thirty minute detention during a routine traffic incident. For these reasons, I would reverse the district court's denial of the motion to suppress.