<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4612**

UNITED STATES OF AMERICA,

                    Plaintiff – Appellee,

          v.

TREMAYNE QUINTA BUGG,

                    Defendant – Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.   Samuel G. Wilson, District Judge.  (7:12-cr-00006-SGW-1)

Argued:  October 31, 2013            Decided:  March 17, 2014

Before TRAXLER, Chief Judge, and KING and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Joel Christopher Hoppe, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia, for Appellant.   Kartic Padmanabhan, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.  **ON BRIEF**: Larry W. Shelton, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Roanoke, Virginia, for Appellant.   Timothy J. Heaphy, United States Attorney, Daniel Howell, Third Year Practice Law Student, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In May 2012, Tremayne Quinta Bugg conditionally pleaded guilty in the Western District of Virginia to charges of possession with intent to distribute cocaine base ("crack cocaine"), in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm by a convicted felon, in contravention of 18 U.S.C. § 922(g)(1). By his plea agreement, Bugg reserved the right to pursue this appeal, in which he solely contests the district court's denial of his motion to suppress evidence seized during the police encounter that led to the crack cocaine and firearm charges. See United States v. Bugg, No. 7:12-cr-00006 (W.D. Va. May 10, 2012), ECF No. 36 (the "Suppression Opinion").[1] Invoking the Fourth Amendment, Bugg contends that law enforcement officers unconstitutionally detained, arrested, and searched him. As explained below, we disagree and thus affirm the judgment pronouncing Bugg's convictions and 151-month sentence.

I.

Following an evidentiary hearing and briefing by the parties, the district court made detailed findings of fact pertinent to Bugg's suppression motion:

---

[1] The unpublished Suppression Opinion is found at J.A. 110-14. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

On December 17, 2011, law enforcement officers staked out an apartment on Hunt Avenue in Roanoke, Virginia, in an attempt to arrest an armed-and-dangerous, six-foot five-inch, 250-pound African American male fugitive with a violent criminal history. During the stake-out, officers watched as a dark-colored sport-utility vehicle approached the apartment and seemingly noticed the police presence. The SUV stopped, made a mid-block u-turn, and sped away from the scene. The officers left their positions and commenced a search for the SUV. In short order, the officers found the vehicle parked in a nearby high-crime neighborhood. The SUV's driver, who fit the fugitive's description (but who, officers later discovered, was not the fugitive), exited the vehicle and got into a white sedan. The sedan pulled away and, after driving a short distance, turned around and re-approached the SUV. Suspecting that their fugitive was now in the sedan, one of the officers activated his car's emergency lights and initiated a stop. Two other officers, riding in an unmarked car behind the SUV, saw Bugg exit the front passenger-side of the parked SUV and focus his attention on the now-stopped sedan. One of the officers in the unmarked car exited his vehicle and directed Bugg to stop in order to answer some questions. Bugg responded unintelligibly, turned away from the officers, and made a movement toward his waistband. Fearing that Bugg was reaching for a weapon, both officers raised their own weapons and ordered Bugg to put his hands up. Bugg complied with that order and the officers' subsequent instruction to place his hands on the SUV's hood.

Soon after, a third officer arrived and asked Bugg to identify himself. When Bugg reached for his wallet to retrieve his identification, he inadvertently exposed a handgun holster on his right hip. The officer removed a loaded .32-caliber Smith & Wesson revolver from the holster. When Bugg then divulged (without prompting from the officers) that he was recently released from prison after serving time for a felony drug charge, the officers handcuffed Bugg and searched him. The officers found a seven-gram bag of crack cocaine and a small bag of "a green leafy substance." Officers then transported Bugg to another location and Mirandized him. Bugg admitted that the

3

revolver was his and that he was on his way to deliver the crack cocaine at the time of the stop.

Suppression Opinion 1-2.

Premised on those findings, the district court ruled that, at the point Bugg was directed to stop and answer questions, the officers "had reasonable, articulable suspicion to initiate a Terry stop." See Suppression Opinion 4; see also Illinois v. Wardlow, 528 U.S. 119, 123 (2000) ("In Terry, we held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." (citing Terry v. Ohio, 392 U.S. 1, 30 (1968))). The court specified that "the following suspicious behavior" justified the officers' stop of Bugg:

> [F]irst, the SUV approached their position, seemed to spot their presence, stopped, abruptly u-turned, and sped away; second, after locating the SUV in a nearby high-crime neighborhood, a man fitting the description of the fugitive they were seeking exited the SUV and entered a waiting sedan that pulled away, drove a short distance, turned around, and re-approached the SUV; and third, when officers stopped the sedan, Bugg exited the parked SUV and focused his attention on the traffic stop.

Suppression Opinion 4. According to the court, "an officer seeing these events unfold sequentially and employing common sense could be reasonably suspicious that criminal activity was afoot and that Bugg was somehow involved." Id. at 5. The court further determined that "[e]ach event succeeding the stop (Bugg

4

making a movement toward his waistband, officers drawing down on Bugg, Bugg inadvertently revealing his hip holster and divulging his felony conviction, and officers arresting and searching Bugg) lawfully flowed from that moment." Id. Thus, the court "f[ound] no constitutional violation requiring suppression." Id.

## II.

In this appeal, which was timely brought pursuant to 28 U.S.C. § 1291, Bugg asserts that the district court erred in deeming the "reasonable, articulable suspicion" standard of Terry v. Ohio, 392 U.S. 1 (1968), to be satisfied. Where, as here, we consider the denial of a motion to suppress, we review a court's legal conclusions de novo and its factual findings for clear error. See United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008). We also construe the evidence in the light most favorable to the prevailing party, i.e., the government. Id.

As the district court appreciated and explained in denying Bugg's motion, see Suppression Opinion 3-4, the existence of reasonable suspicion to justify a Terry stop depends on the totality of the circumstances. See, e.g., United States v. Glover, 662 F.3d 694, 698 (4th Cir. 2011) (citing United States v. Sokolow, 490 U.S. 1, 8 (1989)). Those circumstances include

5

the facts known by the officers and the inferences flowing therefrom. See United States v. Hernandez-Mendez, 626 F.3d 203, 207-08 (4th Cir. 2010). Indeed, "officers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); see also United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) ("Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.").

Even wholly lawful conduct may engender a reasonable suspicion that criminal activity is afoot. See Sokolow, 490 U.S. at 9-10 (observing that "Terry itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation'" (quoting Terry, 392 U.S. at 22)). So long as "[t]he articulated factors together . . . serve to eliminate a substantial portion of innocent travelers," the reasonable suspicion standard may be satisfied. See United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004). Importantly, that "standard is 'less demanding . . . than probable cause,'" though it requires "'more than an inchoate and unparticularized suspicion or hunch of criminal

6

activity.'" Branch, 537 F.3d at 336 (alteration in original) (quoting Illinois v. Wardlow, 528 U.S. 119, 123, 124 (2000)).

We agree with the district court that the events preceding the officers' stop of Bugg — properly considered in their totality — were sufficiently suggestive of criminal activity to demonstrate reasonable suspicion. In the words of the district court: "By the time they initiated the Terry stop, officers had good reason to believe that Bugg was connected in some meaningful way to a suspected dangerous fugitive and that he had participated in highly suspicious vehicle maneuvers. . . . Moreover, the facts, taken together, served to eliminate a substantial portion of innocent travelers." Suppression Opinion 5; see also, e.g., J.A. 47-52, 55-57, 63-64 (evidentiary hearing testimony of Sergeant John Stephens of Roanoke Police Department, describing series of "very suspicious" and "odd" events that culminated in Bugg's unexpected emergence from passenger seat of parked, driverless SUV and his abnormal, intense focus on nearby traffic stop of sedan involving officer unaware that Bugg was watching from "semicovered position").

Though he does not dispute the district court's factual findings, Bugg seeks to detach himself from the suspected fugitive and the irregular vehicle maneuvers. For example, Bugg characterizes the presumed criminal activity as "being a fugitive" and asserts that such activity "was attributable to

7

only the driver of the SUV, who fit the fugitive's description." See Br. of Appellant 14-15 (arguing that "[m]erely being a passenger in a vehicle that was driven by a suspected fugitive does not suggest that the non-fugitive is engaged in criminal behavior"). Bugg further maintains that "[t]he criminal behavior, i.e. being a fugitive, that the officers were investigating followed the suspected fugitive from the SUV" — that is, away from Bugg — "to the sedan." Id. at 15. Finally, Bugg contends that, when "he merely got out of the SUV and stood by it, watching the traffic stop" of the sedan, "his actions [did] not suggest that he was about to commit a crime." Id. at 17. Bugg elaborates that he was in a no-win situation, in that the officers would have found it suspicious if he instead had stayed in the SUV or walked away from the scene. He also offers an innocent explanation for his semicovered position, pointing out that he was simply "standing next to the door from which he had exited." Id. at 18.

We cannot ignore, however, that even after the SUV engaged in evasive maneuvers apparently designed to elude the police, Bugg remained with that parked and driverless vehicle — seemingly awaiting the suspected fugitive's return — while his cohort went on a quick jaunt in the sedan evocative of additional criminal activity, including drug dealing. As Sergeant Stephens explained, Bugg's continued presence with the

8

SUV (whether inside or outside the vehicle) was itself suspicious. See J.A. 56. Meanwhile, Bugg's semicovered position and markedly intense focus on the sedan-related traffic stop evinced that he was a potential threat to officer safety.

In any event, Bugg would have us deem his "stop unjustified based merely on a piecemeal refutation of each individual fact and inference," when we instead "must look at the cumulative information available to the officer[s]." See Branch, 537 F.3d at 337 (internal quotation marks omitted). Accordingly, Bugg has not persuaded us that the district court erred in its reasonable suspicion analysis.[2]

## III.

Pursuant to the foregoing, we affirm the judgment of the district court.

AFFIRMED

---

[2] Because we endorse the district court's reasonable suspicion analysis, we need not consider the government's alternative bases for affirmance. The government asserts, inter alia, that the SUV was seized along with the sedan, thereby enabling the officers to request identification from Bugg as an SUV passenger. See United States v. Soriano-Jarquin, 492 F.3d 495, 500-01 (4th Cir. 2007). Additionally, the government argues that Bugg himself was not seized until the officers — fearing that Bugg was reaching for a weapon when he made the movement toward his waistband — drew their own weapons and ordered Bugg to put his hands up. See Lender, 985 F.2d at 155.