CALABRIA, Judge.
 

 *678
 
 Taseen Tyree Johnson ("defendant") appeals from an order denying his motion to suppress evidence that was recovered pursuant to an officer safety frisk conducted during an investigatory detention. We affirm.
 

 I.
 
 Background
 

 In August 2013, defendant was charged with two counts of trafficking opium or heroin, one count of possession with intent to sell and deliver heroin, and one count of possession of drug paraphernalia. At
 
 *679
 
 the hearing on defendant's motion to suppress the drugs, the State presented testimony that detailed the following events.
 

 During the afternoon of 28 May 2013, Officer Matthew Ward ("Officer Ward") of the North Carolina Division of Motor Vehicles Licensing and Theft Bureau was conducting a traffic enforcement patrol in Brunswick County. After Officer Ward spotted a tan Chevrolet Silverado with an expired license plate, he stopped the truck, approached the driver's side, and engaged the driver, Todd Waters ("Waters"), in conversation. As they talked, Officer Ward noticed several cell phones lying on the truck's center console and loose items scattered throughout the truck. In particular, Officer Ward noticed a box-shaped "PCM" device on the hump of the floorboard between the driver and passenger seats. A PCM is a computer system that controls a vehicle and is typically located in the engine compartment. Although it is not illegal to possess a PCM device or to keep it in the passenger compartment of a vehicle, Officer Ward found its placement there unusual.
 

 As Officer Ward scanned the vehicle, both Waters and defendant, the passenger, appeared nervous and could not provide consistent answers to Officer Ward's basic questions regarding their travel destination and origin. Defendant's chest rose and fell rapidly as he breathed, and he mumbled vague responses to Officer Ward's questions. Even when Officer Ward asked defendant to speak up, defendant continued to mumble incoherently.
 

 After speaking with Waters and defendant and observing the truck's interior, Officer Ward asked Waters for his license and registration. Waters could not produce his registration, but he did provide his license. Shortly thereafter, Brunswick County Deputy Sheriff Peter Arnold ("Deputy Arnold"), who was patrolling in the area, stopped to assist Officer Ward. Deputy Arnold approached the truck's passenger side while Officer Ward spoke with Waters. Deputy Arnold noticed defendant was "showing signs of extreme nervousness"-his neck veins were pulsing and he was breathing heavily. In addition, Officer Ward told Deputy Arnold that both Waters and defendant displayed erratic behavior, and that they were unable to state where they were going.
 

 Officer Ward returned to his patrol car and checked the status of Waters' vehicle and license. He learned the truck was properly registered to Waters, but the license and inspection had expired. After citing Waters for an expired license plate and inspection, Officer Ward notified Waters of his court date. Although Officer Ward had completed the
 
 *680
 
 original purpose of the stop, he asked Waters to step out of the truck and answer additional questions. Waters agreed. Officer Ward then walked Waters back to the patrol car, received consent to search him, and patted him down.
 

 Meanwhile, Deputy Arnold returned to the passenger side of the truck and continued to speak with defendant through the open window. Deputy Arnold again noticed that defendant
 
 *757
 
 looked nervous. Throughout their conversation, defendant provided noncommittal answers to Deputy Arnold's questions regarding the parties' travel destination.
 

 As he questioned defendant, Deputy Arnold noticed a rectangular bulge, measuring approximately five by seven inches, in defendant's crotch area underneath his loose-fitting basketball shorts. Deputy Arnold asked defendant to identify the bulge, and defendant responded that it was his testicles. Not reassured, Deputy Arnold had defendant step out of the vehicle, keeping his hands away from his crotch and waistline. Since he believed the bulge might be a handgun, Deputy Arnold began performing an officer-safety frisk on defendant. When Deputy Arnold reached for the bulge, he touched it, and a Ziploc bag containing a rectangular package of heroin fell from defendant's shorts. At the patrol car, Officer Ward heard Deputy Arnold shout "72," meaning "in custody." Ninety seconds had elapsed since Officer Ward asked Waters to step out of his vehicle, and the entire stop lasted approximately fifteen minutes. Waters and defendant were eventually arrested and transported to the Brunswick County jail.
 

 After defendant was charged and indicted with,
 
 inter alia,
 
 trafficking heroin he moved to suppress the heroin evidence on the grounds that Deputy Arnold lacked reasonable suspicion to extend the detention and frisk him. At the suppression hearing, the trial court heard testimony from Officer Ward and Deputy Arnold, as well as narcotics agent Jared Zeller of the Brunswick County Sheriff's Office. Defendant did not offer any testimony or evidence to the court. At the conclusion of the hearing, the trial court denied defendant's motion, finding that the detention of Waters and defendant was not unreasonably prolonged and the totality of the circumstances supported a reasonable suspicion that Waters and defendant were criminally engaged. The court also found that Deputy Arnold's frisk of defendant was reasonable and justified in light of his safety concerns. Consequently, defendant entered a guilty plea and reserved his right to appeal.
 

 *681
 

 II.
 
 Analysis
 

 A.
 
 Factual Findings
 

 Defendant first argues that portions of the trial court's findings of fact are erroneous and unsupported by the evidence. This Court's review of a suppression order "is strictly limited to determining whether the trial court's underlying findings of fact are supported by competent evidence, and whether those factual findings in turn support the trial court's ultimate conclusions of law."
 
 State v. Robinson,
 

 221 N.C.App. 509
 
 , 517,
 
 729 S.E.2d 88
 
 , 96 (2012) (citation omitted).
 

 Our Supreme Court has recognized a trial court's duty to "hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision, in the first instance, as to whether or not a constitutional violation of some kind has occurred."
 
 State v. Cooke,
 

 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 619-20 (1982). As a result, "[w]e accord great deference to the trial court's findings of fact," and any findings left unchallenged by defendant "on appeal are binding and deemed to be supported by competent evidence."
 
 State v. Knudsen,
 

 229 N.C.App. 271
 
 , 275,
 
 747 S.E.2d 641
 
 , 645 (2013) (citation omitted).
 

 The trial court made the following findings of fact relevant to this appeal:
 

 3. Officer Ward initiated a traffic stop and the vehicle stopped without incident. Officer Ward identified himself and asked the driver for his license and registration. The driver, ... Waters, was unable to produce his registration but he did have his operator's license that listed his address in Raleigh, NC. Walters [sic] could not give a clear answer as to whether or not he resided in Brunswick County or Raleigh. Throughout the conversation Waters continued to change his story about where he currently resided;
 

 4. While speaking with Water's [sic], Officer Ward noted that Waters was speaking into one cell phone and had two additional cell phones on the center console of the vehicle[;]
 
 [2]
 

 *758
 

 *682
 
 5. One of Officer Ward's duties is to investigate motor vehicle theft. Officer Ward noted that there was a vehicle power control module [ (the PCM) ] located on the floor of the vehicle, and that this would be unusual to possess;
 

 6. Turning his attention to the passenger of the vehicle, Officer Ward attempted to question [defendant] but [he] would mumble his answers and could not be clearly understood. Officer Ward also noted that [defendant's] chest was rising and falling rapidly and he appeared to be very nervous, more so than one would be during a usual traffic stop;
 

 7. Officer Ward determined that ... Waters' operator's license was in fact inactive;
 

 8. At this time Officer Ward advised Deputy Peter Arnold ..., who was assisting him in the traffic stop, that both parties were acting extremely nervous;
 

 9. Officer Ward issued ... Waters a citation for the traffic violations and advised him he was free to go. Having terminated the traffic stop, Officer Ward asked ... Waters if he would mind exiting the vehicle and answer a few questions;
 

 10. Officer Ward asked ... Waters if he could pat him down for his safety and ... Waters indicated that "yes" he could. Before completing his pat down, Officer Ward heard Deputy Arnold state "72["] him, which signified to Officer Ward to take Mr. Waters into custody. Officer Ward stated he was told by Deputy Arnold that [defendant] had heroin in his crotch area;
 

 11. Deputy Arnold testified that Officer Ward relayed his observations to him and while watching [defendant] he observed ... two distinct corners of a rectangular shaped bulge underneath [defendant's] shorts in the crotch area. When he [i]nquired of [defendant] as to what it was, [defendant] responded "my balls";
 

 *683
 
 12. Deputy Arnold then asked [defendant] to step out of the vehicle so that he could conduct a pat down for his safety. Before Deputy Arnold could complete his pat down, a zip lock back containing a large quantity of heroin fell from [defendant's] shorts. Deputy Arnold then yelled to Officer Ward to place [Waters] in custody[.]
 

 Based on these findings, the court made two conclusions of law, one of which is relevant to the present discussion:
 

 1. The pat down by Deputy Arnold of this defendant was conducted with reasonable suspicion and it was conducted without the benefit of a search warrant, it was a reasonable act, constitutional in nature taken [by] Deputy Arnold who had been advised of the conflicting and/or lack of information provided by both Waters and [defendant], both Officer Ward and Deputy Arnold's observation of the extreme nervousness of both parties, Officer Ward's [o]bservation of a device that in his experience is used in criminal activity, and Deputy Arnold's observation of an object under [defendant's] clothing that could have been a weapon and posed a danger to himself or Officer Ward.
 

 Defendant's main contention is that an erroneous factual finding is mixed in with the trial court's first conclusion of law. He argues that the reference to "Officer Ward's [o]bservation of a device that in his experience is used in criminal activity" is actually a finding of fact. In context, the "device" to which the trial court refers is the PCM that was noted in Finding No. 5. We agree that this characterization of the PCM is a finding of fact mingled with a conclusion of law. However, we do not base our review of findings of fact and conclusions of law on the label in the order, but rather, on the substance of the finding or conclusion.
 
 See
 

 *759
 

 State v. Icard,
 

 363 N.C. 303
 
 , 308,
 
 677 S.E.2d 822
 
 , 826 (2009) ("Although labeled findings of fact, these quoted findings mingle findings of fact and conclusions of law.... While we give appropriate deference to the portions of Findings No. 37 and 39 that are findings of fact, we review
 
 de novo
 
 the portions of those findings that are conclusions of law."). Reading Finding No. 5 and the challenged portion of Conclusion No. 1 together and in context, it is apparent that given Officer Ward's responsibility to investigate motor vehicle theft, the trial court made a logical inference from his testimony that he believed the PCM's presence in the truck's cabin might be associated with criminal activity. Written Finding No. 5 takes note of this inference. Therefore, Finding No. 5 and the portion of Conclusion No. 1 that is a finding of fact, are supported by the evidence.
 
 *684
 
 Defendant also argues that "[s]everal of the trial court's in-court findings of fact were not supported by competent evidence and should not be considered by this Court." However, while defendant challenges some of the trial court's oral statements during rendition of the order as being unsupported by the evidence, he does not challenge the related findings of fact in the written order. For example, the trial court stated that Waters and defendant would not say where they lived, were behaving erratically, and were very nervous after the traffic citation was issued. By contrast, written Findings Nos. 3 and 6 plainly convey that the erratic behavior occurred before the issuance of the citation. Officer Ward's testimony supports the trial court's written findings on this issue. Notably, since there was no material conflict in the evidence presented at defendant's suppression hearing, the trial court was not required to make specific findings at all.
 
 State v. Bartlett,
 

 368 N.C. 309
 
 , 312,
 
 776 S.E.2d 672
 
 , 674 (2015) ("A written determination setting forth the findings and conclusions is not necessary, but it is the better practice.... [O]nly a material conflict in the evidence-one that potentially affects the outcome of the suppression motion-must be resolved by explicit factual findings that show the basis for the trial court's ruling. When there is no conflict in the evidence, the trial court's findings can be inferred from its decision. Thus, our cases require findings of fact only when there is a material conflict in the evidence and allow the trial court to make these findings either orally or in writing."). Even if there is some conflict between oral findings and ones that are reduced to writing, the written order controls for purposes of appeal.
 
 See
 

 Durham Hosiery Mill Ltd. P'ship v. Morris,
 

 217 N.C.App. 590
 
 , 593,
 
 720 S.E.2d 426
 
 , 428 (2011) ("The general rule is that the trial court's written order controls over the trial judge's comments during the hearing.").
 

 Here, the trial court both rendered its ruling from the bench and later entered a written order. There is no need for us to address the exact wording of the trial court's rendition where a written order was later entered. In addition, there was no material conflict in the evidence presented at the suppression hearing. Because defendant does not challenge the written findings of fact as unsupported by the evidence, his argument is without merit.
 

 B.
 
 Reasonable Suspicion, Investigatory Detention (Terry Stop), and Officer Safety Pat Down (Terry Frisk)
 

 Defendant next challenges Deputy Arnold's search of his person, contending it lacked the requisite constitutional justification. We disagree.
 

 *685
 
 Based on the findings of fact, the trial court entered the following conclusions of law:
 

 1. The pat down by Deputy Arnold of this defendant was conducted with reasonable suspicion and it was conducted without the benefit of a search warrant, it was a reasonable act, constitutional in nature taken [by] Deputy Arnold who had been advised of the conflicting and/or lack of information provided by Waters and Johnson, both Officer Ward and Deputy Arnold's observation of the extreme nervousness of both parties, Officer Ward's [o]bservation of a device that in his experience is used in criminal activity, and Deputy Arnold's observation of an object under [defendant's] clothing that
 
 *760
 
 could have been a weapon and posed a danger to himself or Officer Ward.
 

 2. The pat down was reasonable and was conducted by Deputy Arnold involving a passenger or passengers of said vehicle for the Officer's own protection and the Court determines that the search violates no constitutional or statutory rights of this defendant, State or federal, and that the defendant's Motion to Suppress and the same is hereby, denied.
 

 "A trial court's conclusions of law on a motion to suppress are reviewed
 
 de novo
 
 and are subject to a full review, under which this Court considers the matter anew and freely substitutes its own judgment for that of the trial court.... The conclusions of law 'must be legally correct, reflecting a correct application of applicable legal principles to the facts found.' "
 
 Knudsen,
 

 229 N.C.App. at 281
 
 ,
 
 747 S.E.2d at 649
 
 (citations omitted).
 

 The Fourth Amendment to the United States Constitution guarantees,
 
 inter alia,
 
 "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. State officials' actions must comport with the Fourth Amendment, as its requirements are "enforceable against the States through the Due Process Clause" of the Fourteenth Amendment.
 
 Wolf v. Colorado,
 

 338 U.S. 25
 
 , 27-28,
 
 69 S.Ct. 1359
 
 , 1361,
 
 93 L.Ed. 1782
 
 , 1785 (1949). When police officers stop an automobile-even for a brief and limited purpose-its occupants are seized within the meaning of the Fourth Amendment.
 
 Delaware v. Prouse,
 

 440 U.S. 648
 
 , 653,
 
 99 S.Ct. 1391
 
 , 1395-96,
 
 59 L.Ed.2d 660
 
 , 667 (1979).
 

 *686
 
 This case involved a rather fluid situation: Officer Ward stopped Waters for driving with an expired registration and inspection. With Deputy Arnold's assistance, Officer Ward extended the stop beyond its original justification by asking Waters to step out of his truck and answer additional questions. The extension prompted Deputy Arnold's further questioning of defendant, which culminated in the
 
 Terry
 
 frisk defendant now challenges.
 

 In
 
 Terry v. Ohio,
 
 the United States Supreme Court held the Fourth Amendment requires that a brief investigatory stop of an individual be supported by reasonable suspicion.
 
 392 U.S. 1
 
 ,
 
 88 S.Ct. 1868
 
 ,
 
 20 L.Ed.2d 889
 
 (1968). Pursuant to
 
 Terry,
 
 Deputy Arnold's frisk of defendant may only be justified by two independent criteria. First, in order to conduct an investigatory detention-a "
 
 Terry
 
 stop"-in the first place, the police must have reasonable suspicion "that criminal activity may be afoot."
 

 Id.
 

 at 30
 
 ,
 
 88 S.Ct. at 1884
 
 ,
 
 20 L.Ed.2d at 911
 
 . Second, the police must also have reasonable suspicion "that the persons with whom [they are] dealing may be armed and presently dangerous" in order to justify "a carefully limited search [-a "
 
 Terry
 
 frisk"-]of the outer clothing of such persons in an attempt to discover weapons which might be used to assault [them]."
 

 Id.
 

 at 30-31
 
 ,
 
 88 S.Ct. at 1885
 
 ,
 
 20 L.Ed.2d at 911
 
 . The law has become well established that
 
 Terry
 
 principles apply to routine traffic stops.
 

 On appeal, defendant concedes the lawfulness of both the initial traffic stop and Deputy Arnold's questions after the stop was completed. According to defendant, Deputy Arnold's further questioning of defendant and Officer Ward's further questioning of Waters constituted consensual police-citizen encounters. Defendant argues instead that when Deputy Arnold "command [ed]" him to exit the vehicle with his hands and arms raised, the consensual encounter suddenly became an investigatory detention that was unsupported by reasonable suspicion of criminal activity. As the argument goes, since Deputy Arnold lacked reasonable suspicion to support an investigatory detention in the first instance, he also lacked the authority to conduct a protective frisk. Defendant also contends that once Deputy Arnold gave that command, defendant was "seized ... for purposes of the Fourth Amendment, and any consent given for a search [or frisk] afterwards was not voluntary...."
 

 The consequence of defendant's argument is that he skips over the traffic stop's extension and asks us to focus solely on the
 
 Terry
 
 frisk that Deputy Arnold performed on him. We reject defendant's characterization of the
 
 *761
 
 extension as a consensual encounter for two reasons. To begin, in contrast to his argument on appeal, defendant vigorously argued before
 
 *687
 
 the trial court that
 
 none
 
 of his interactions with Deputy Arnold during the extension were consensual. Our Supreme Court "has long held that where a theory argued on appeal was not raised before the trial court, 'the law does not permit parties to swap horses between courts in order to get a better mount in the Supreme Court.' "
 
 State v. Sharpe,
 

 344 N.C. 190
 
 , 194,
 
 473 S.E.2d 3
 
 , 5 (1996) (quoting
 
 Weil v. Herring,
 

 207 N.C. 6
 
 , 10,
 
 175 S.E. 836
 
 , 838 (1934) );
 
 see also
 

 State v. Benson,
 

 323 N.C. 318
 
 , 321-22,
 
 372 S.E.2d 517
 
 , 518-19 (1988) ("no swapping horses" rule applied where the defendant relied on one theory at trial level as the basis for his written motion to suppress and then asserted another theory on appeal). In addition, and more importantly, the extension was an investigatory
 
 Terry
 
 stop supported by reasonable suspicion of criminal activity.
 
 [3]
 

 Generally, when a lawful traffic stop has been made, "the scope of the detention must be carefully tailored to its underlying justification."
 
 State v. Jackson,
 

 199 N.C.App. 236
 
 , 241,
 
 681 S.E.2d 492
 
 , 496 (2009). Once the original purpose of the stop has been addressed and the police officer has issued the requisite warning or citation, a driver and his passengers must be allowed to continue on their way.
 
 State v. Myles,
 

 188 N.C.App. 42
 
 , 45,
 
 654 S.E.2d 752
 
 , 754 (2008) ;
 
 United States v. Rusher,
 

 966 F.2d 868
 
 , 876 (4th Cir.1992). To prolong a traffic stop and justify further investigation, the detaining officer must either obtain the driver's consent or possess reasonable and articulable suspicion of other criminal activity.
 
 Jackson,
 

 199 N.C.App. at 241-42
 
 ,
 
 681 S.E.2d at 496
 
 . Likewise, in order to lawfully detain a driver or passenger for further investigation, an officer's reasonable suspicion must be based on information obtained during the lawful detention of the vehicle's occupants up to the point that the stop's initial purpose has been fulfilled.
 
 Myles,
 

 188 N.C.App. at 51
 
 ,
 
 654 S.E.2d at 758
 
 . Although it is not possible to precisely articulate
 
 *688
 
 what constitutes "reasonable suspicion," our evaluation of the extended traffic stop in this case is animated by the following principles.
 

 First,
 
 Terry's
 
 reasonable suspicion standard is "less demanding ... than probable cause."
 
 Illinois v. Wardlow,
 

 528 U.S. 119
 
 , 123,
 
 120 S.Ct. 673
 
 ,
 
 145 L.Ed.2d 570
 
 , 576 (2000). Only a minimal level of objective justification is required for a
 
 Terry
 
 stop: a police officer must simply point to "specific and articulable facts which, taken together with rational inferences from those facts,"
 
 Terry,
 

 392 U.S. at 21
 
 ,
 
 88 S.Ct. at 1880
 
 ,
 
 20 L.Ed.2d. at 906
 
 , reveal "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity."
 
 Wardlow,
 

 528 U.S. at 124
 
 ,
 
 120 S.Ct. at 676
 
 ,
 
 145 L.Ed.2d at 576
 
 (quoting
 
 Terry,
 

 392 U.S. at 27
 
 ,
 
 88 S.Ct. at 1883
 
 ,
 
 20 L.Ed.2d. at 909
 
 (internal quotation marks omitted)). Thus, the evidentiary showing required to demonstrate reasonable suspicion is "considerably less than [a] preponderance of the evidence."
 

 Id.
 

 at 123
 
 ,
 
 120 S.Ct. at 675
 
 ,
 
 145 L.Ed.2d at 576
 
 .
 

 Second, a police officer's decision to conduct an investigatory stop must be evaluated objectively. By its plain language, the Fourth Amendment proscribes only unreasonable searches, and to that end, the
 
 Terry
 
 Court emphasized that the term "reasonable" necessitates an objective
 
 *762
 
 search-and-seizure analysis.
 
 392 U.S. at 21-22
 
 ,
 
 88 S.Ct. at 1879-1881
 
 ,
 
 20 L.Ed.2d at 906
 
 . "Whether a Fourth Amendment violation has occurred, [therefore,] 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' ... and not on the officer's actual state of mind at the time the challenged action was taken."
 
 Maryland v. Macon,
 

 472 U.S. 463
 
 , 470-71,
 
 105 S.Ct. 2778
 
 , 2783,
 
 86 L.Ed.2d 370
 
 , 378 (1985) (citations omitted). Accordingly, "if sufficient objective evidence exists to demonstrate reasonable suspicion, a
 
 Terry
 
 stop is justified regardless of a police officer's subjective intent."
 
 United States v. Branch,
 

 537 F.3d 328
 
 , 337 (4th Cir.2008).
 

 Third, a reviewing court must make its reasonable-suspicion determination based on a commonsense approach. Since the "concept of reasonable suspicion is somewhat abstract[,]" and our nation's highest court has "deliberately avoided reducing it to a neat set of legal rules,"
 
 United States v. Arvizu,
 

 534 U.S. 266
 
 , 274,
 
 122 S.Ct. 744
 
 , 751,
 
 151 L.Ed.2d 740
 
 , 750 (2002) (citations and internal quotations marks omitted), "common sense and ordinary human experience must govern over rigid criteria."
 
 United States v. Sharpe,
 

 470 U.S. 675
 
 , 685,
 
 105 S.Ct. 1568
 
 , 1575,
 
 84 L.Ed.2d 605
 
 , 615 (1985). Indeed, reasonable suspicion is a "nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' "
 
 Ornelas v. United States,
 

 517 U.S. 690
 
 , 695,
 
 116 S.Ct. 1657
 
 , 1661,
 
 134 L.Ed.2d 911
 
 , 918 (1996) (citations omitted). In other words, "context matters: actions that may
 
 *689
 
 appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances."
 
 Branch,
 

 537 F.3d at 336-37
 
 . As such, courts should " credit[ ] the practical experience of officers who observe on a daily basis what transpires on the street[,]" (
 
 United States v. Lender,
 

 985 F.2d 151
 
 , 154 (4th Cir.1993) ), so as not to "indulge in unrealistic second-guessing" of the judgment calls law enforcement officials must invariably make.
 
 Sharpe,
 

 470 U.S. at 686
 
 , 105 S.Ct. at 1575,
 
 84 L.Ed.2d at
 
 616 ;
 
 United States v. Cortez,
 

 449 U.S. 411
 
 , 418,
 
 101 S.Ct. 690
 
 , 695,
 
 66 L.Ed.2d 621
 
 , 629 (1981) ("The process [by which reasonable suspicion is determined] does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same-and so are law enforcement officers.").
 

 Fourth, because reasonable suspicion analysis is necessarily holistic, it requires examination of "the entire mosaic ..., not single tiles."
 
 Branch,
 

 537 F.3d at 337
 
 (citation omitted). Accordingly, to determine whether an officer had reasonable suspicion to conduct an investigatory stop, courts must consider "the totality of the circumstances-the whole picture."
 
 Cortez,
 

 449 U.S. at 417
 
 ,
 
 101 S.Ct. at 695
 
 ,
 
 66 L.Ed.2d at 629
 
 . This means the legality of a
 
 Terry
 
 stop turns on "the cumulative information available" to the officer who conducted it.
 
 Arvizu,
 

 534 U.S. at 273
 
 ,
 
 122 S.Ct. at 750
 
 ,
 
 151 L.Ed.2d at 750
 
 . Courts should therefore refuse to "find a stop unjustified based merely on a 'piecemeal refutation of each individual' fact and inference" that an officer produces to support his actions.
 
 Branch,
 

 537 F.3d at 337
 
 (citation omitted).
 

 With these principles in mind, we turn to a reasonable suspicion analysis, considering two separate inquiries: the reasonableness of the stop's extension-the
 
 Terry
 
 stop-and the reasonableness of the
 
 Terry
 
 frisk.
 

 1.
 
 Terry
 
 Stop
 

 As to the first inquiry, Officer Ward extended the traffic stop by asking Waters to step out of the truck and answer additional questions, and Deputy Arnold assisted by questioning defendant through the open passenger window. "In determining whether the further detention was reasonable," we must look at "the totality of the circumstances" to see if there was a particularized and objective basis for suspecting legal wrongdoing.
 
 State v. Hernandez,
 

 170 N.C.App. 299
 
 , 308,
 
 612 S.E.2d 420
 
 , 426 (2005).
 

 *690
 
 This Court has recognized that "[f]acts giving rise to a reasonable suspicion include
 
 *763
 
 nervousness, sweating, failing to make eye contact, [and] conflicting statements[.]"
 

 Id.
 

 (citing
 
 State v. McClendon,
 

 350 N.C. 630
 
 , 638-639,
 
 517 S.E.2d 128
 
 , 133 (1999) ). Our Supreme Court has clarified that "[n]ervousness, like all other facts, must be taken in light of the totality of the circumstances. It is true that many people do become nervous when stopped by an officer of the law. Nevertheless, nervousness is an appropriate factor to consider when determining whether a basis for a reasonable suspicion exists."
 
 McClendon,
 

 350 N.C. at 638-639
 
 ,
 
 517 S.E.2d at 134
 
 . The
 
 McClendon
 
 Court concluded that the defendant-driver's extreme nervousness combined with his inconsistent statements concerning who owned the car were sufficient to establish reasonable suspicion.
 
 Id.
 
 at 637,
 
 517 S.E.2d at
 
 133 ;
 
 see also
 

 Wardlow,
 

 528 U.S. at 124
 
 ,
 
 120 S.Ct. at 676
 
 ,
 
 145 L.Ed.2d at 576
 
 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").
 

 In
 
 State v. Euceda-Valle,
 
 an officer stopped a speeding vehicle and approached the passenger side.
 
 182 N.C.App. 268
 
 , 270,
 
 641 S.E.2d 858
 
 , 860-61 (2007). In response to the officer's question regarding the vehicle's ownership, the defendant vaguely stated that it belonged to a "friend."
 
 Id.
 
 at 270,
 
 641 S.E.2d at 861
 
 . The officer noted both the defendant and the driver avoided eye contact and appeared nervous.
 

 Id.
 

 In particular, the officer observed the defendant's carotid artery "beating profusely" in his neck.
 

 Id.
 

 Additionally, the officer noticed several empty Red Bull cans littering the interior of the vehicle and air freshener fumes emanating from inside.
 

 Id.
 

 After calling for support, the officer detained the defendant so as to permit a dog sniff of the vehicle's exterior.
 

 Id.
 

 The dog alerted at the driver's side and, upon further investigation, the officers discovered packages of controlled substances.
 
 Id.
 
 at 271,
 
 641 S.E.2d at 861
 
 . In holding reasonable suspicion justified the detention and canine sniff, this Court considered the nervousness of the driver and passenger, the defendant's pronounced nervousness, both parties' refusal to make eye contact, the aroma of air freshener, and the vehicle's registration to someone other than its occupants.
 
 Id.
 
 at 274-75,
 
 641 S.E.2d at 863-64
 
 . Similar, though not identical, factors exist in this case as those found in
 
 McClendon
 
 and
 
 Euceda-Valle.
 

 [4]
 

 *691
 
 Indeed, several observations permitted Officer Ward to form reasonable suspicion that criminal activity was afoot: (1) Waters could not answer basic questions, such as where he was coming from and where he lived; (2) Waters "changed his story from one to the next"; (3) while it was eventually determined that Waters owned the truck, he could offer no explanation as to why he did not have his registration; (4) Officer Ward found the presence of the PCM in the truck's passenger compartment to be unusual based on his training and experience; and (5) when defendant-whose chest was rising and falling at a rapid rate, and who appeared "very nervous"-addressed the same basic questions that Officer Ward had asked Waters, defendant mumbled and gave vague answers.
 
 [5]
 

 *764
 
 Given the circumstances, Officer Ward was rightfully concerned about Waters and defendant's erratic behavior. We cannot say that Officer Ward was required to regard this behavior as innocuous.
 

 Furthermore, Deputy Arnold's observations during the initial stop are also relevant here. When he first approached the truck, Deputy Arnold observed defendant's "extreme nervousness," his rapid breathing and elevated heart rate, and the pulsating vein in his neck. Upon his second approach, Deputy Arnold was surprised by defendant's continued, "extreme nervousness," especially since Waters "was [receiving] his citation and would be free to go." Significantly, Deputy Arnold further testified: "You could actually see [defendant's] entire stomach moving. I was-I mean, it was almost as if his whole body was jiggling. He was just so nervous, he was like in a shake."
 

 Although some, or even all, of these factors can be construed as innocent conduct, "[i]t must be rare indeed that an officer observes behavior consistent [o]nly with guilt and incapable of innocent interpretation."
 
 United States v. Price,
 

 599 F.2d 494
 
 , 502 (2d Cir.1979) (citations
 
 *692
 
 omitted). And while each factor may individually be insufficient to show reasonable suspicion, in concert they reveal an encounter filled with uncertainties and inconsistencies.
 
 Terry
 
 recognized that police officers are often required to make immediate, context-dependent judgments based on their training. Such was the case here. Given the conduct that Officer Waters and Deputy Arnold had observed-extreme nervousness, conflicting stories, evasive behavior, and the unusual placement of the PCM-we refuse to "unrealistic[ally] second-guess[ ]" their decisions to further investigate Waters and defendant.
 
 Sharpe,
 

 470 U.S. at 686-87
 
 , 105 S.Ct. at 1575,
 
 84 L.Ed.2d at 616
 
 . Based on the totality of circumstances, reasonable suspicion existed to support a reasonable and cautious police officer's determination that criminal activity may have been afoot. Accordingly, defendant's detention beyond the traffic stop's initial purpose was constitutional.
 

 2.
 
 Terry
 
 Frisk
 

 Having concluded that defendant was lawfully detained, we now turn to the lawfulness of the
 
 Terry
 
 frisk Deputy Arnold performed on defendant. During a lawful stop, "an officer may conduct a pat down search, for the purpose of determining whether the person is carrying a weapon, when the officer is justified in believing that the individual is armed and presently dangerous."
 
 State v. Sanders,
 

 112 N.C.App. 477
 
 , 480,
 
 435 S.E.2d 842
 
 , 844 (1993) (citing
 
 Terry,
 

 392 U.S. at 24
 
 ,
 
 88 S.Ct. at 1881-82
 
 ,
 
 20 L.Ed.2d at
 
 908 ). As the
 
 Terry
 
 Court recognized: "[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."
 
 392 U.S. at 27
 
 ,
 
 88 S.Ct. at 1883
 
 ,
 
 20 L.Ed.2d at 909
 
 .
 

 A
 
 Terry
 
 frisk is justified by the " 'legitimate and weighty' interest in officer safety[.]"
 
 Arizona v. Johnson,
 

 555 U.S. 323
 
 , 331,
 
 129 S.Ct. 781
 
 , 786,
 
 172 L.Ed.2d 694
 
 , 702 (2009) (quoting
 
 Pennsylvania v. Mimms,
 

 434 U.S. 106
 
 , 110,
 
 98 S.Ct. 330
 
 , 333,
 
 54 L.Ed.2d 331
 
 , 336 (1977) ). As such, the frisk "is limited to the person's outer clothing and to the search for weapons that may be used against the officer."
 
 State v. Shearin,
 

 170 N.C.App. 222
 
 , 226,
 
 612 S.E.2d 371
 
 , 376 (2005). But an officer "need not be absolutely certain that the individual is armed[.]"
 
 Terry,
 

 392 U.S. at 27
 
 ,
 
 88 S.Ct. at 1883
 
 ,
 
 20 L.Ed.2d at 909
 
 . Rather, the police are "entitled to formulate 'common-sense conclusions' about 'the modes or patterns of operation of certain kinds of lawbreakers' " in reasoning that an individual may be armed.
 
 State v. Butler,
 

 331 N.C. 227
 
 , 234,
 
 415 S.E.2d 719
 
 , 723 (1992) (quoting
 
 *693
 

 Cortez,
 

 449 U.S. at 418
 
 ,
 
 101 S.Ct. at 695
 
 ,
 
 66 L.Ed.2d at
 
 629 ). The crucial inquiry is "whether a reasonably prudent man in the
 
 *765
 
 circumstances would be warranted in the belief that his safety or that of others was in danger."
 
 Terry,
 

 392 U.S. at 27
 
 ,
 
 88 S.Ct. at 1883
 
 ,
 
 20 L.Ed.2d at 909
 
 (citations omitted). Furthermore, "[e]vidence of contraband, plainly felt during a pat-down or frisk, may ... be admissible,"
 
 State v. Robinson,
 

 189 N.C.App. 454
 
 , 458-59,
 
 658 S.E.2d 501
 
 , 504 (2008), if its "contour or mass makes its identity immediately apparent [.]"
 
 Sanders,
 

 112 N.C.App. at 482
 
 ,
 
 435 S.E.2d at 845
 
 (citation omitted).
 

 In the instant case, when Deputy Arnold saw the bulge in defendant's shorts, he was justified in questioning defendant about it. The fact that defendant was a passenger and not the driver of the truck makes no difference.
 
 See
 

 Maryland v. Wilson,
 

 519 U.S. 408
 
 , 414,
 
 117 S.Ct. 882
 
 , 886,
 
 137 L.Ed.2d 41
 
 , 48 (1997) (recognizing that "the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver"). After defendant was asked about the rectangular bulge-which was located in his crotch area and measured approximately seven by five inches-he flippantly replied that it was his "balls." Deputy Arnold had no reason to believe that statement was truthful and, based on his training and experience, he believed the bulge could be a firearm. Defendant's nervousness, evasiveness, and failure to identify what was in his shorts, coupled with the size and nature of the object, gave Deputy Arnold a specific articulable basis for suspecting that defendant might be armed.
 
 See
 

 Mimms,
 

 434 U.S. at 111-12
 
 ,
 
 98 S.Ct. at 333-34
 
 ,
 
 54 L.Ed.2d at 337-38
 
 (finding reasonable suspicion that individual may be armed based solely on officer's observance of bulge in the defendant's jacket). Deputy Arnold then conducted a minimally intrusive frisk pursuant to
 
 Terry,
 
 justified at the time by a reasonable suspicion that he and Officer Ward were in a situation that could escalate and place both officers in danger.
 
 See
 

 Sanders,
 

 112 N.C.App. at 482
 
 ,
 
 435 S.E.2d at 845
 
 (
 
 Terry
 
 frisk of the driver, who was stopped at a roadblock by two state troopers, was justified when the driver provided no license or registration, admitted he was not the car's owner, and had a bulge in his front pocket the size of two fists).
 

 In sum, the totality of circumstances supported a reasonable suspicion that defendant was armed and dangerous. And since the bulge-which was discovered to be heroin-immediately fell from defendant's shorts when Deputy Arnold attempted to grab it, the frisk was conducted within the bounds marked by
 
 Terry.
 
 Accordingly, we conclude that the trial court's findings support its conclusion that Deputy Arnold's
 
 Terry
 
 frisk of defendant's outer clothing did not violate the Fourth Amendment.
 

 *694
 

 III.
 
 Conclusion
 

 Officer Ward and Deputy Arnold's decision to prolong the traffic stop and detain Waters and defendant for investigative purposes was supported by reasonable suspicion of criminal activity. In addition, Deputy Arnold's
 
 Terry
 
 frisk of defendant, an allowable officer safety measure, was supported by reasonable suspicion that defendant might be armed. Consequently, we affirm the trial court's denial of defendant's motion to suppress.
 

 AFFIRMED.
 

 Judges STROUD and TYSON concur.
 

 [2]
 

 Officer Ward testified that he "noticed a couple different cell phones on the console[,]" and that Waters was talking on a hands-free device when Officer Ward made his initial approach of the truck. The record does not reveal exactly how many cell phones were in the truck, but Officer Ward's testimony suggests that the truck contained more phones than occupants. Taken in context, it is reasonably clear that Officer Ward surmised that, on some level, the existence of multiple phones might indicate that Waters and defendant were using some phones to conduct legitimate activity and others to conduct illegitimate or illegal activity. The trial court apparently made a similar inference, which we believe was permissible and supported by competent evidence.
 

 [3]
 

 We note that the trial court's order appears to be based, in part, on the rationale that the stop's extension (i.e. the investigatory detention or
 
 Terry
 
 stop) was based on reasonable suspicion. Officer Ward stated that he asked Waters additional questions in order to "further his investigative stop." The trial court made an oral finding on the prolonged stop, but did not articulate a clear position on the extension in its written order. However, the trial court then made a rather muddled in-court conclusion, stating there "was reasonable articulable suspicion to ask for consent and prolong the stop in this case." As indicated below, an extension may be justified by either reasonable suspicion or consent; but such suspicion is not necessary to obtain consent. In any event, we cannot review the legality of Deputy Arnold's
 
 Terry
 
 frisk without first determining whether defendant was lawfully detained during the stop's extension. Furthermore, since there was no material conflict in the evidence, explicit findings regarding the existence of reasonable suspicion to prolong the stop were not necessary.
 
 Bartlett,
 

 368 N.C. at 312
 
 ,
 
 776 S.E.2d at
 
 674 ;
 
 State v. Johnston,
 

 115 N.C.App. 711
 
 , 714,
 
 446 S.E.2d 135
 
 , 137 (1994) ("Where there is no material conflict in the evidence, findings and conclusions are not necessary....").
 

 [4]
 

 The United States Supreme Court has recently held that police officers may not prolong an otherwise-completed traffic stop in order to conduct a dog sniff for drugs if they lack reasonable suspicion that criminal activity is afoot beyond a traffic violation.
 
 Rodriguez v. United States,
 
 --- U.S. ----,
 
 135 S.Ct. 1609
 
 ,
 
 191 L.Ed.2d 492
 
 (2015). "[P]rior to
 
 Rodriguez,
 
 many jurisdictions-including North Carolina-applied a
 
 de minimis
 
 rule, which allowed police officers to prolong a traffic stop 'for a very short period of time' to investigate for other criminal activity unrelated to the traffic stop-for example, to execute a dog sniff-though the officer[s] ha[d] no reasonable suspicion of other criminal activity."
 
 State v. Warren,
 
 --- N.C.App. ----, ----,
 
 775 S.E.2d 362
 
 , 365 (2015) (citations omitted),
 
 aff'd,
 
 --- N.C. ----,
 
 782 S.E.2d 509
 
 (2016). To the extent that the holdings in those cases apply the
 
 de minimis
 
 rule, they have been overruled by
 
 Rodriguez.
 
 Although
 
 McClendon
 
 and
 
 Euceda-Valle
 
 (which cited and relied on
 
 McClendon
 
 ) involved prolonged traffic stops that culminated in dog sniffs, neither court applied the
 
 de minimus
 
 rule to reach their holding. Rather, the
 
 McClendon
 
 and
 
 Euceda-Valle
 
 Courts applied a classic reasonable suspicion analysis to the extended stops in each case.
 
 See
 

 McClendon,
 

 350 N.C. at 636-37
 
 ,
 
 517 S.E.2d at
 
 132-33 ;
 
 Euceda-Valle,
 

 182 N.C.App. at 274-75
 
 ,
 
 641 S.E.2d at 863
 
 .
 

 [5]
 

 Although we do not explicitly rely on Finding No. 4 in the trial court's written order as a factor in our reasonable suspicion analysis, the presence of multiple cell phones appears to have played a role in Officer Ward's decision to conduct an investigatory detention. In the context of this case, Officer Ward's observations regarding the cell phones provided additional, legitimate support for that decision.