STROUD, Judge.
Defendant appeals from the trial court's order denying his motion to suppress and judgments convicting him of driving while impaired, assault on a government official/employee, communicating threats, and malicious conduct by a prisoner. We vacate defendant's judgment for malicious conduct by a prisoner, dismiss defendant's ineffective assistance of counsel argument without prejudice, affirm the trial court's order denying defendant's motion to suppress, and conclude there was no error with the remaining judgments.
I. Background
The State's evidence showed that on 17 May 2016, Sergeant Joshua Layhew and Officer Charles Eason of the Selma Police Department responded to a 911 call regarding the unauthorized use of a motor vehicle at a Chinese restaurant. When Officer Eason arrived at the restaurant, the caller told him her boyfriend, defendant, was headed toward a nearby hotel. Sergeant Layhew was already at the hotel, as he was also looking for the alleged unauthorized vehicle use, and he saw defendant sitting in the driver's seat of a different vehicle with the ignition engaged. Officer Eason drove the caller to the hotel where she identified defendant as the person who had taken her car without her consent. Defendant smelled of alcohol. Officer Eason attempted to question defendant, but he refused to answer. Officer Eason described defendant's speech as hostile, babbling, and slurred.
Defendant was arrested and "became belligerent[.]" Defendant refused to submit to any testing, told Officer Eason there would be repercussions, and threatened to fight him if he attempted a blood test. Defendant also spit on Officer Eason and head-butted him. Much of the interaction after defendant's arrest was videotaped.
Defendant moved to suppress the evidence against him, arguing there was a lack of probable cause for his arrest. The trial court denied the motion. Defendant was tried by a jury and found guilty of driving while impaired, assault on a government official/employee, communicating threats, and malicious conduct by a prisoner. The trial court sentenced him, and he now appeals.
II. Indictment
Defendant first contends that "the trial court erred in allowing the State to amend the malicious conduct indictment at the beginning of trial where the defense prepared its case based on the representation that the bodily fluid in question was blood." (Original in all caps). We review the trial court's decision to allow the State to amend an indictment de novo . See State v. White , 202 N.C. App. 524, 527, 689 S.E.2d 595, 596-97 (2010). Generally,
[a] criminal bill of indictment is sufficient if it expresses the charge against the defendant in a plain, intelligible, and explicit manner. Specifically, the indictment must allege all of the essential elements of the crime sought to be charged. North Carolina General Statutes, section 15A-923(e) provides that a bill of indictment may not be amended. This provision has been interpreted to mean that a bill of indictment may not be amended in a manner that substantially alters the charged offense. A non-essential variance is not fatal to the charged offense, and any averment unnecessary to charge the offense may be disregarded as inconsequential surplusage. Therefore, allegations added to, deleted from, or modified in an indictment beyond the essential elements of the crime sought to be charged are irrelevant and may be treated as surplusage.
State v. McCallum , 187 N.C. App. 628, 634-35, 653 S.E.2d 915, 920 (2007) (citations, quotation marks, brackets, and ellipses omitted). But even if the change is not to an "essential element," this is not alone determinative as our Court recently explained in State v. Simmons , --- N.C. App. ----, ----, 808 S.E.2d 306, 310 (2017). Simmons explains,
Our Supreme Court has interpreted the term amendment under N.C.G.S. § 15A-923(e) to mean any change in the indictment which would substantially alter the charge set forth in the indictment. In determining whether an amendment amounts to a substantial alteration, courts must consider the multiple purposes served by indictments. These purposes are as follows:
(1) to provide certainty so as to identify the offense, (2) to protect the accused from twice being put in jeopardy for the same offense, (3) to enable the accused to prepare for trial, and (4) to enable the court, on conviction or plea of guilty or nolo contendere , to pronounce sentence according to the rights of the case.
Simmons , --- N.C. App. at ----, 808 S.E.2d at 310 (citation omitted).
In Simmons , this Court synthesized prior case law to explain when changes to an indictment were substantial and when they were not, concluding they were substantial in that case because
the State broadened the scope of Defendant's original indictment to allege that he had trafficked in "opiates," a category of controlled substances, rather than "heroin," a specific controlled substance. It did so for the purpose of bringing an additional controlled substance-hydrocodone-within the ambit of the indictment. Although heroin is an opiate, not all opiates are heroin. Therefore, when the original indictment was amended to include hydrocodone, a new substance was effectively alleged in the indictment.
Id. at ----, 808 S.E.2d at 311 (quotation marks omitted).
In this case, malicious conduct by a prisoner is broadly defined as "[a]ny person in ... custody" who "knowingly and willfully throws, emits, or causes to be used as a projectile, bodily fluids or excrement at a person who is an employee of the State or a local government while the employee is in the performance of the employee's duties[.]" N.C. Gen. Stat. § 14-258.4 (2015). The indictment originally alleged that defendant had "used as a projectile a bodily fluid, blood" at Officer Eason. The State was allowed to remove the term "blood" from the indictment.
Defendant contends that the word "blood" was not mere surplusage and explains it is similar to the word "heroin" in Simmons ; by removing the word "heroin" the State had a much broader range of opiates to choose from; here too, by removing the word "blood" the State had a much broader range of bodily fluids to choose from in its evidence at trial. See Simmons , --- N.C. App. at ----, 808 S.E.2d at 311. Here, the fluid actually was spit. We agree with the State that "[t]he indictment did not require the naming of the bodily fluid[,]" but once it did, the State could not then remove that term to expand to other bodily fluids not included in the term "blood." See generally State v. Silas , 360 N.C. 377, 383, 627 S.E.2d 604, 608 (2006) (concluding that the State was not required to name the underlying felony in an indictment for breaking and entering, but once it had, it could not change it). Under Simmons , we conclude the trial court erred in allowing the State to amend its indictment and to remove the term "blood." See generally Simmons , --- N.C. App. ----, 808 S.E.2d 306. Therefore, we vacate defendant's judgment for malicious conduct by a prisoner.
III. Ineffective Assistance of Counsel
Defendant next contends his counsel provided ineffective assistance "by failing to move to suppress on the basis that Sergeant Layhew lacked reasonable suspicion to stop" him. (Original in all caps). Specifically, he argues that "where Sergeant Layhew was seeking a black male named Brian Watson who had stolen a Mazda 626, he did not have reasonable suspicion to stop a black male whose name he did not know whom he saw behind the wheel of a Plymouth Voyager."
A claim of ineffective assistance of counsel, to be successful, requires proof: (1) that the professional assistance that defendant received was unreasonable and (2) the trial would have had a different outcome in the absence of such assistance.
Claims for ineffective assistance of counsel brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be brought without such ancillary procedures as the appointment of investigators or an evidentiary hearing. Claims which are not properly asserted on direct appeal are properly dismissed without prejudice to defendant's right to reassert them during a subsequent proceeding on a motion for appropriate relief.
State v. Boyd , 209 N.C. App. 418, 428, 705 S.E.2d 774, 781 (2011) (citation and quotation marks omitted).
The focus of defendant's motion to suppress below was whether there was probable cause for the arrest by Officer Eason , not Sergeant Layhew's reasonable suspicion for an investigative stop. The trial court's heading in its order denying defendant's motion to suppress is "Warrantless Arrest Based on Probable Cause[.]" Probable cause for a warrantless arrest is a higher standard than reasonable suspicion to stop, see, e.g., State v. Campbell , 188 N.C. App. 701, 705, 656 S.E.2d 721, 725 (2008) ("It is well settled that the standard for reasonable suspicion is less demanding than that for probable cause." (Citation and quotation marks omitted) ). Officer Eason developed probable cause to arrest defendant after his girlfriend had identified him and the Mazda, and he had determined defendant was intoxicated. Because defendant argued a different legal issue in the trial court, the focus of the findings of fact and the order as a whole is the actions of Officer Eason, not Sergeant Layhew. Nevertheless, we have the testimony of Officer Eason from the hearing on the motion to suppress and from both officers at trial. Based upon this testimony, which is undisputed, the record is sufficient for us to determine that if defendant had moved to suppress based upon Sergeant Layhew's encounter with him, the motion would have been denied, so the outcome would not be different. See Boyd , 209 N.C. App. at 428, 705 S.E.2d at 781.
At the hearing, Officer Eason testified about the investigation of the unauthorized use of the Mazda. Both he and Sergeant Layhew were working at the same time to respond to a 911 call for unauthorized use of a vehicle. Officer Eason had gone to talk to the girlfriend in person, and she told him that she and defendant "had been going to get something to eat. They had got into an argument .... he was leaving and she told him that she, you know-she wasn't giving him permission to leave with her vehicle, and that he just took the car keys and drove off, leaving her there." Officer Eason went to the Chinese restaurant where defendant left the caller and picked her up and took her to the parking lot of the hotel where Sergeant Layhew had reported seeing the Mazda.
At trial, Sergeant Leyhew testified that before Officer Eason arrived at the parking lot, Sergeant Layhew had checked the license plate of the Mazda and confirmed it was the correct car. His "main concentration at that time was ensuring this was the right Mazda" since he had previously stopped another Mazda which was not the right Mazda. In the same parking lot, he saw defendant sitting in a van, which was running, and "[i]n a short period of time, he cut the car off and exited the van and walked back towards the motel." "[M]aybe a couple of minutes" later, defendant began walking back to the van; Officer Eason was on the way to the hotel with defendant's girlfriend. Sergeant Layhew "engaged [defendant] in conversation, just wanted him to hang around so Officer Eason could finish his investigation into the unauthorized use. He wanted to "get his version of the account of whatever would have happened that the-at the Chinese restaurant," to make sure there was no domestic violence going on, and to get a "full and complete investigation." While Sergeant Layhew was talking to defendant, based upon his speech and the "strong, pungent odor of an alcoholic beverage coming from his person and breath," Sergeant Layhew immediately believed that defendant was impaired.
When Officer Eason arrived, defendant's girlfriend confirmed the identification of her car and of defendant as the person who had taken it. Sergeant Layhew was "trying to speak with [defendant], who at that point seemed to be not cooperative" with him. Officer Eason also "tried speaking with him to get his side of the story. ... I had one side; I wanted to get both sides of the story, you know, as to why he had taken the vehicle, if the vehicle belonged to him, who the vehicle actually belonged to, and see why he had taken it." When Officer Eason approached, he also noticed the odor of alcohol and that defendant had "watery" eyes but thought maybe defendant had been crying because of the argument at the Chinese restaurant. While talking to defendant, Officer Eason noticed his babbling, slurred speech, and "inability to answer a question coherently[,]" and also determined that he was impaired by alcohol. We will address the encounter beyond this point in regard to defendant's argument regarding denial of his motion to suppress based upon Sergeant Layhew's actions.
Defendant argues that Sergeant Layhew had no basis for reasonable suspicion to approach him because he was responding to a call regarding "a black male" who "had taken a white Mazda to the Master's Inn." Defendant contends that since he was in a different vehicle, Sergeant Layhew was not justified in stopping him. Defendant contends Sergeant Layhew did not have reasonable suspicion to stop him simply for being in the same parking lot as the white Mazda. Defendant argues that while Sergeant Layhew said he questioned defendant and wanted to detain him for Officer Eason to arrive, the trial court made no findings on whether his actions, not merely his intent, rose to the level of a stop that would require constitutional analysis under the Fourth Amendment as defendant contends.
The State contends the initial brief interaction between Sergeant Layhew and defendant did not rise to the level of a seizure or even a Terry stop. Contrary to defendant's argument, Sergeant Layhew had more information than simply the fact that he was looking for a "black male" when he approached him in the parking lot. Defendant's argument ignores the totality of the circumstances. The State argues that Sergeant Layhew knew that a crime had been committed when he found the Mazda in the parking lot, and it was reasonable for him to approach defendant to talk to him as part of that investigation, even if he had no suspicion that defendant was the person who had taken it. Since defendant was in the parking lot when Sergeant Layhew arrived, as part of his investigation, he could talk to defendant to see if he had seen the person who left the Mazda there. A law enforcement officer does not need reasonable suspicion of criminal activity by the person he is talking to in order to ask a person a question as part of an investigation. See generally State v. Isenhour , 194 N.C. App. 539, 542, 670 S.E.2d 264, 267 (2008) ("Our United States Supreme Court has held that law enforcement officers do not violate the Fourth Amendment's prohibition against unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when police officers have no reason to suspect that a person is engaged in criminal behavior, they may pose questions, ask for identification, and request consent to search provided they do not induce cooperation by coercive means." (Citations and quotation marks omitted) ). Law enforcement officers often talk to many people who may be potential witnesses or who may have information about a crime.
An encounter between a law enforcement officer and a citizen does not implicate the Fourth Amendment's prohibition against unreasonable searches and seizures in the absence of a "seizure" of the person. In Florida v. Bostick , 501 U.S. 429, 115 L.Ed.2d 389 (1991), the Supreme Court of the United States held that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in [ Terry v. Ohio , 392 U.S. 1, 19, n. 16, 88 S. Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889, 905, n. 16 (1968) ]: "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Id . at 434, 115 L.Ed.2d at 398. Even in the absence of any suspicion that an individual is engaged in criminal activity, law enforcement officers may pose questions, ask for identification, and request consent to search provided they do not induce cooperation by coercive means.
State v. Williams , 201 N.C. App. 566, 568-69, 686 S.E.2d 905, 907 (2009) (citations, quotation marks, and ellipses omitted).
And even if Sergeant Layhew initially had no suspicion that defendant was the person who took the Mazda, he had seen defendant sitting in the driver's seat of a running vehicle when he arrived. He approached defendant as he was returning to the van and immediately believed defendant was impaired based upon defendant's odor of alcohol, slurred speech, and appearance. At that point, he would have had reasonable suspicion to do a Terry stop based upon defendant's driving while impaired, even if he still did not consider defendant to be associated with the taking of the Mazda. See generally State v. Johnson , 246 N.C. App. 677, 686, 783 S.E.2d 753, 760 (2016) ("[I]n order to conduct an investigatory detention-a 'Terry stop'-in the first place, the police must have reasonable suspicion that criminal activity may be afoot." (Citation and quotation marks omitted) ). And none of the evidence suggests anything more than a Terry stop before Officer Eason arrived. There was no evidence that Sergeant Layhew seized defendant or that defendant was not free to leave.
Absent physical force, a seizure occurs only if, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.
Williams , 201 N.C. App. at 569, 686 S.E.2d at 907-08 (citations and quotation marks omitted).
Based upon the record before us, it is apparent that even if defendant's counsel had moved to suppress based upon Sergeant Layhew's initial approach and questioning of defendant, the trial court would have denied the motion, so the outcome would have been the same. This argument is without merit.
III. Motion to Suppress
Last, turning to defendant's motion to suppress as argued before the trial court, defendant contends "the trial court erred in denying the motion to suppress evidence stemming from the arrest for driving while impaired where there was insufficient evidence of impairment." (Original in all caps).
The standard of review for a motion to suppress is whether the trial court's findings of fact are supported by the evidence and whether the findings of fact support the conclusions of law. The court's findings are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. The trial court's ruling on a motion to suppress is afforded great deference upon appellate review as it has the duty to hear testimony and weigh the evidence.
State v. Wainwright , 240 N.C. App. 77, 83-84, 770 S.E.2d 99, 104 (2015) (citations, quotation marks, and brackets omitted).
Defendant does not challenge the trial court's findings of fact but contends they were simply not enough to establish probable cause to arrest him. Defendant contends that objective field sobriety tests or breath tests were necessary to form the basis for probable cause. We disagree.
An arrest is constitutionally valid whenever there exists probable cause to make it.
Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Probable cause exists when there is a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty.
Probable cause can be established through the use of informants. In utilizing an informant's tip, probable cause is determined using a totality-of-the circumstances analysis which permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip. A known informant's information may establish probable cause based on a reliable track record, or an anonymous informant's information may provide probable cause if the callers information can be independently verified.
State v. Chadwick , 149 N.C. App. 200, 202-03, 560 S.E.2d 207, 209 (2002) (citations, quotation marks, brackets, and emphasis omitted). Here, the unchallenged and binding findings of fact, see In re Schiphof , 192 N.C. App. 696, 700, 666 S.E.2d 497, 500 (2008) ("Unchallenged findings of fact are presumed correct and are binding on appeal."), establish that Officer Eason was responding to a 911 call. When Officer Eason met with the 911 caller, she explained defendant had just taken her mother's car without her permission; Officer Eason and the caller then headed to find defendant at a nearby hotel. Officer Eason asked the 911 caller to remain calm and allow him to speak to defendant so he could get his side of the story. Officer Eason spoke with Sergeant Layhew and then "approached the Defendant to speak with him, and immediately smelled a strong, pungent odor of alcohol coming from the Defendant's person." "As Officer Eason looked at the Defendant's face, he noticed that the Defendant's eyes looked like he had been crying, and were very watery." "Officer Eason then explained to the Defendant that he had been accused of taking a vehicle without the owner's permission, and asked the Defendant if he had done so." Defendant rephrased the question back to Officer Eason. Based on their conversation, Officer Eason "formed the opinion that the Defendant had consumed a sufficient amount of an impairing substance as to appreciably impair his mental and physical faculties" and "believed that the Defendant was impaired by alcohol." "Based on the facts and information that had been presented to Officer Eason, he placed the Defendant under arrest" for driving while impaired and unauthorized use of a motor vehicle.
Defendant takes each individual fact and cites law on why that fact alone is not enough to form probable cause for impaired driving, but again, defendant fails to consider the totality of the circumstances, see State v. Benters , 367 N.C. 660, 664, 766 S.E.2d 593, 597 (2014) ("The common-sense, practical question of whether probable cause exists must be determined by applying a totality of the circumstances test." (citation and quotation marks omitted) ), which include an informant claiming defendant had just driven off in her vehicle; defendant being beside the vehicle, smelling of alcohol with watery eyes, and being unresponsive to Officer Eason's questions. The trial court correctly concluded that these facts supported probable cause to arrest defendant. See Chadwick , 149 N.C. App. at 202-03, 560 S.E.2d at 209.
V. Conclusion
In conclusion, we vacate defendant's judgment for malicious conduct by a prisoner, dismiss defendant's ineffective assistance of counsel claim, affirm the trial court's order denying defendant's motion to suppress, and conclude there was no error with the remaining judgments.
VACATED in part; DISMISSED in part; AFFIRMED in part; NO ERROR in part.
Report per Rule 30(e).
Judges DILLON and INMAN concur.