**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 15-4204**

———————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

     v.

RENE RAMIREZ-JIMENEZ,

                Defendant - Appellant.

———————

Appeal from the United States District Court for the District of South Carolina, at Columbia. Joseph F. Anderson, Jr., Senior District Judge. (3:13-cr-00486-JFA-5)

———————

Argued: May 12, 2016           Decided: June 20, 2016

———————

Before NIEMEYER, GREGORY, and HARRIS, Circuit Judges.

———————

Affirmed by unpublished opinion. Judge Harris wrote the opinion, in which Judge Niemeyer and Judge Gregory joined.

———————

**ARGUED:** Aimee Zmroczek, A.J.Z. LAW FIRM, LLC, Columbia, South Carolina, for Appellant. Jimmie Ewing, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** William N. Nettles, United States Attorney, John David Rowell, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

Rene Ramirez-Jimenez was convicted by a jury of federal drug-trafficking offenses. His sole challenge on appeal is to the denial of his motion to suppress certain evidence uncovered during a traffic stop and later used to identify him at trial. For the reasons that follow, we affirm.

**I.**

**A.**

On September 27, 2012, Drug Enforcement Administration (DEA) agents, assisted by a Richland County Sheriff's Department task force, arranged a controlled drug purchase. The target of their investigation was Eduardo Valencia-Gaeta, a methamphetamine dealer who went by the nickname "Lelo." The DEA agents outfitted their confidential informant, Dennis Kasabian, with concealed audio and video equipment, and sent him to a Lowe's parking lot to meet Lelo.

Shortly after Kasabian met Lelo, a dark Chevrolet Silverado truck with two occupants parked directly behind Lelo's vehicle, leading the agents to wonder whether the Silverado was involved in the deal. Lelo told Kasabian that they would need to go to a nearby restaurant, Monterrey's, to break down the package of methamphetamine to be purchased. The agents' interest in the Silverado heightened when Lelo, Kasabian, and the occupants of

2

the Silverado all drove to Monterrey's in their respective vehicles. Once they arrived at the restaurant, Lelo and the occupants of the Silverado went inside, and a short time later Lelo returned outside to complete the transaction with Kasabian. Kasabian understood the occupants of the Silverado, whom he had not met previously and did not know by name, to be the suppliers of the methamphetamine. After the buy, DEA agents met Kasabian at a secure location to debrief and retrieve the purchased drugs.

At the DEA's direction, Kasabian called Lelo to negotiate another purchase for later the same day, and it was agreed that Kasabian would purchase four ounces of methamphetamine for $5,400. Kasabian promptly returned to Monterrey's to meet Lelo. Before completing the transaction with Kasabian, Lelo again spoke with the occupants of the Silverado inside Monterrey's. According to DEA agents observing the restaurant, the Silverado had remained at Monterrey's the entire time. After the deal was done, Kasabian rendezvoused with the DEA agents and gave them the drugs that he had acquired. Lab testing showed that the substance from both buys was methamphetamine.

Following the second controlled buy, the DEA maintained continuous surveillance on the Silverado. In an effort to identify the occupants of the Silverado — but without tipping its hand as to the ongoing drug investigation — the DEA

3

requested that the South Carolina Highway Patrol initiate a traffic stop of the vehicle. At approximately 4:02 p.m., Trooper Michael Shank spotted a littering violation and pulled the truck over.

Because the ensuing stop is the focus of this appeal, we recount it in some detail. Trooper Shank first asked the driver and passenger of the Silverado for their identification. Neither had a driver's license, but both provided identification cards. The driver of the vehicle was identified as Omar Gomez-Suarez, and the passenger as the appellant, Rene Ramirez-Jimenez. Trooper Shank then asked both occupants to exit the vehicle. When Gomez-Suarez and Ramirez-Jimenez stood outside of their vehicle, the police's in-car video recording captured their likenesses. At approximately 4:06 p.m., Trooper Shank asked Gomez-Suarez for consent to search the vehicle, which Gomez-Suarez granted. Trooper Shank then commenced an initial search of the truck.

Around this time, a second South Carolina Highway Patrol officer, Trooper Derrick Melton, arrived on the scene and took charge of the traffic violation component of the stop. Trooper Melton began preparing citations for littering and failing to produce a driver's license. At approximately 4:22 p.m., once the citations were complete, Trooper Melton called dispatch to verify the identification cards. Just over ten minutes later,

4

Melton was able to confirm Gomez-Suarez's address and learn that he did not possess a valid driver's license. At that point, at roughly 4:35 p.m., Trooper Melton took photographs of the identification cards and returned them to Gomez-Suarez and Ramirez-Jimenez.

In the meantime, at the instruction of the DEA, Trooper Shank continued to search the Silverado for evidence of drugs or money from the controlled drug transactions. After failing to uncover any contraband in his initial pass-through of the vehicle, Shank called on the York County Interdiction Team to execute a more comprehensive search. The search continued until the police found a wad of money tied up in a washcloth, slightly less than one hour after the vehicle originally was stopped.

The DEA asked the troopers not to arrest the Silverado's occupants. Instead, Trooper Melton informed Gomez-Suarez and Ramirez-Jimenez that they could leave, but would need to post bond for driving without a license. The troopers then returned the money found inside the washcloth, less the amount of the bond, and let Gomez-Suarez and Ramirez-Jimenez go.

The entire stop lasted just over one hour. The troopers did not seize any evidence. But during the course of the traffic stop, Shank and Melton were able to observe several distinctive tattoos on the passenger's arms, including one of the appellant's first name, "Rene."

5

**B.**

In June 2013, a grand jury in the United States District Court for the District of South Carolina charged Ramirez-Jimenez with two methamphetamine-related offenses: one count of conspiracy to possess with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 846; and one count of possession with intent to distribute and distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A). Ramirez-Jimenez was arrested in April 2014.

Ramirez-Jimenez planned to argue at trial that he had been misidentified, and was not in fact the passenger in the Silverado. In aid of that defense, he moved to suppress the identification evidence recovered from the September 27 traffic stop: the in-car video recordings and still photographs showing his likeness, and the troopers' observations of his tattoos. Ramirez-Jimenez conceded that the initial stop of the car was valid, based on probable cause of a littering violation. The problem, Ramirez-Jimenez argued, was that the duration of the roughly hour-long stop was excessive. Once Trooper Melton finished preparing the citations and checking background information, Ramirez-Jimenez contended, the tasks tied to the traffic violation were completed, and he should have been

6

released — more than 20 minutes before he actually was given the go-ahead to leave.

The district court rejected that argument and denied the motion to suppress. The initial stop of the vehicle, the district court held, was justified on two independent grounds: Not only was there probable cause of a traffic violation, or littering, but the officers also had probable cause to believe that the occupants of the Silverado were engaged in drug-trafficking activity. The district court noted that the stop was extended by the absence of driver's licenses and the need to verify the occupants' identification cards. And the court determined that Gomez-Suarez gave valid consent to search the vehicle, requiring additional time. With "all those factors coming together," the district court concluded, the "duration of the stop was not unreasonable." J.A. 35.

At trial, Ramirez-Jimenez continued to press his misidentification defense, arguing that he was not in fact the passenger in the Silverado on the day in question. The government rebutted with testimony from Lelo, the target of the investigation, and Gomez-Suarez, the driver, who both identified Ramirez-Jimenez as the passenger in the Silverado and were able to describe his role in the drug operation. Trooper Shank, Trooper Melton, and a Richland County task force officer who assisted the DEA during the operation also identified Ramirez-

7

Jimenez as the passenger, based on their own observations during the traffic stop and preceding surveillance. For good measure, the government also introduced video and still photographs from the traffic stop to show that Ramirez-Jimenez was the passenger in the truck. The photographs included several shots of the passenger's distinctive tattoos, which matched Ramirez-Jimenez's, and the picture of the passenger's identification card.

The jury convicted Ramirez-Jimenez of the two drug-trafficking offenses with which he was charged. The district court sentenced Ramirez-Jimenez to 365 months' imprisonment followed by five years of supervised release. This timely appeal followed.

## II.

Ramirez-Jimenez's sole challenge on appeal is to the district court's denial of his motion to suppress the identification evidence from the traffic stop. We review the factual findings underlying a motion to suppress for clear error and the district court's legal determinations de novo. See United States v. Davis, 690 F.3d 226, 233 (4th Cir. 2012). When a suppression motion has been denied, we construe the evidence in the light most favorable to the government. See United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998). For the

reasons discussed below, we affirm the district court's denial of the motion to suppress.

**A.**

As the Supreme Court has explained, a "routine traffic stop" is a Fourth Amendment seizure akin to a so-called Terry stop, see Terry v. Ohio, 392 U.S. 1 (1968), and like a Terry stop, it may last no longer than is necessary to accomplish its purposes. Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015). Once "tasks tied to the traffic infraction" — checking identifications, writing citations, and the like — have been completed, the purpose of a traffic stop has been fulfilled and a vehicle's occupants generally are free to go. Id.; see United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008). Appealing to this well-established case law, Ramirez-Jimenez argues that the duration of his approximately hour-long stop was constitutionally excessive, extending beyond the time required to prepare citations and check identification by at least twenty minutes.

What Ramirez-Jimenez overlooks, however, is that his was not a "routine traffic stop," 135 S. Ct. at 1614, of the sort contemplated by Rodriguez. When the police pulled over the Silverado, they had reason to suspect its occupants not only of littering but also of drug trafficking. And when the police

have some distinct justification, independent of the initial traffic violation, for a prolonged detention, then they are not bound by the usual time limits on traffic stops. See United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011); Branch, 537 F.3d at 336. A reasonable suspicion of illegal activity apart from the traffic violation will authorize a separate investigatory stop under Terry, see Branch, 537 F.3d at 336; and probable cause of such illegal activity, a more demanding standard, will authorize a more intrusive seizure, up to and including an actual arrest, see Ortiz, 669 F.3d at 444.

We agree with the district court that the police here possessed probable cause of drug trafficking, sufficient to justify the protracted detention of the Silverado's occupants.[1] "Probable cause is a flexible, common-sense standard," requiring only that the "facts available to the officer would warrant a man of reasonable caution in the belief" that the suspect has committed a crime. See Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion) (internal quotation marks omitted). Under the "collective-knowledge" doctrine, we consider not only the

---

[1] Accordingly, we need not consider the government's alternative contention that despite its roughly hour-long duration, the seizure also may be sustained as an investigatory Terry stop based on reasonable suspicion of criminal activity. See United States v. Sharpe, 470 U.S. 675 (1985) (sustaining 20-minute stop as within the scope of Terry and declining to set outer time limit for Terry stops).

first-hand observations of the police officers actually making the stop, but also the facts known to the DEA agents and transmitted to those officers. See United States v. Massenburg, 654 F.3d 480, 492 (4th Cir. 2011). Evaluating the totality of the circumstances, as we must, see Maryland v. Pringle, 540 U.S. 366, 371 (2003), we find ample support for a probable-cause determination.

The undisputed evidence[2] indicates that in the hours immediately before the traffic stop, the DEA carefully monitored two controlled purchases of methamphetamine, with the occupants of the Silverado playing a role in each. Soon after Kasabian, the DEA's confidential informant, and Lelo, the target methamphetamine dealer, first met in a parking lot, the DEA agents observed the occupants of the Silverado travel in tandem with Lelo and Kasabian to the restaurant, Monterrey's. And once the vehicles arrived at Monterrey's, the occupants of the Silverado accompanied Lelo inside — where, Lelo told Kasabian, the package of methamphetamine could be divided. As one of the DEA agents leading the operation testified, that conduct indicated that the occupants of the Silverado were Lelo's suppliers. The Silverado remained at Monterrey's through the

---

[2] Ramirez-Jimenez does not contest the government's description of the conduct preceding the traffic stop, nor offer any alternative, innocent explanation for that conduct.

11

second buy at the restaurant. And significantly, the DEA maintained constant surveillance on the Silverado as the driver and passenger left the restaurant, drove to the highway, and ultimately were stopped by the police, confirming that the occupants remained the same throughout the day's events.

When these facts are "viewed from the standpoint of an objectively reasonable police officer," Ornelas v. United States, 517 U.S. 690, 696 (1996), it is plain that they support the troopers' reasonable belief that the occupants of the Silverado were involved in a conspiracy to distribute methamphetamine. The inculpatory evidence was robust, and we routinely uphold probable-cause searches based upon less. See, e.g., United States v. Laing, 538 F.2d 83, 84-85 (4th Cir. 1976) (per curiam) (probable cause to search defendant for narcotics possession where main evidence was tip of reliable informant). Given the probable cause of drug trafficking, the police were justified in conducting an extended stop.

### B.

We also conclude, as a separate and additional basis for our decision, that even if the prolonged detention exceeded constitutional limits, the outcome of this case would remain the same. To the extent any of the identification evidence to which Ramirez-Jimenez objects could have been tainted by an unconstitutionally extended detention, its admission was

12

harmless error, in light of the overwhelming evidence of Ramirez-Jimenez's guilt. See United States v. Holness, 706 F.3d 579, 598 (4th Cir. 2013) (constitutional error harmless beyond a reasonable doubt where "judgment was not substantially swayed by the error" (internal quotation mark omitted)).

First, the government presented extensive evidence, entirely independent of the traffic stop in question, that Ramirez-Jimenez was indeed the passenger in the Silverado on September 27, 2012. The first witness to make the identification was a Richland County task force officer who, along with the DEA, monitored the Silverado at Monterrey's. The second was Lelo, who identified Ramirez-Jimenez from his own observations on September 27. Finally, Gomez-Suarez, the driver of the Silverado, not only identified Ramirez-Jimenez as his passenger, but also testified that he worked with him for roughly a year prior to September 27, meeting with him four times a week to deliver drugs. And to confirm that witness testimony, the government introduced still photographs of the Silverado's passenger entering and exiting the vehicle in the Monterrey's parking lot.

Second, the government presented additional evidence of identification that, though acquired in connection with the traffic stop, could not have been tainted by any unconstitutional extension of that stop. For instance, Troopers

13

Shank and Melton were able to identify Ramirez-Jimenez as the Silverado's passenger, in part because of his distinctive tattoos. And both observed Ramirez-Jimenez during the initial portion of the stop, devoted to tasks related to the traffic violation, which Ramirez-Jimenez concedes was constitutional. The jury also viewed substantial physical evidence from the stop that linked Ramirez-Jimenez to the Silverado: footage from the troopers' in-car video systems depicting Ramirez-Jimenez and still photographs of Ramirez-Jimenez and his identification card. Again, all of that evidence was acquired while the officers addressed the littering violation — the portion of the stop that Ramirez-Jimenez leaves unchallenged.

Taken together, this independent evidence of identification was overwhelming. We are confident that even if the duration of Ramirez-Jimenez's detention had crossed the constitutional line, the suppression of any tainted identification evidence would not have affected the outcome of the trial.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

14